FOURTH DIVISION

March 31, 2003

No. 1-02-0084

BALMORAL RACING CLUB, INC., OGDEN ) Appeal from the

FAIRMOUNT, INC., HAWTHORNE RACE ) Circuit Court

COURSE, INC. and MAYWOOD PARK ) of Cook County.

TROTTING ASSOCIATION, INC., )

)

Plaintiffs-Appellants, )

v. ) No. 01 CH 05694

)

RALPH M. GONZALES, Chairman, ) 

Illinois Racing Board, WILLIAM J. CHAMBLIN, )

WILLIAM E. JACKSON, JAMES M. KANE, )

JOSEPH F. KINDLON, LOUISE E. )

O'SULLIVAN, WILLIAM J. PARRILLO, ) 

LORNA E. PROPES, LEON SHLOFROCK AND )

JOHN B. SIMON, Members Thereof, ) 

DANIEL W. HYNES, Comptroller, and )

GLEN BROWER, Director, Department of )

Revenue. ) The Honorable 

) John K. Madden,

Defendants-Appellees. ) Judge Presiding.  

PRESIDING JUSTICE THEIS delivered the opinion of the court:

Plaintiffs, Balmoral Racing Club, Inc., Ogden Fairmount, Inc., Hawthorne Race Course, Inc., and Maywood Park Trotting Association, Inc. (plaintiffs), appeal from the circuit court’s dismissal under sections 2-615 and 2-619 of the Code of Civil Procedure (735 ILCS 5/2-615, 2-619 (West 2000))
 of their amended complaint for declaratory relief.  On appeal, plaintiffs argue: (1) that the complaint was not barred by sovereign immunity; (2) that they adequately stated a cause of action in that they were entitled under a 1999 amendment to the Illinois Horse Racing Act of 1975 (Racing Act) (230 ILCS 5/1 through 55 (West Supp. 1999)) to reimbursement of certain taxes paid to the Illinois Racing Board (Board); and (3) that the voluntary payment doctrine is not a bar to their requested relief.  For the following reasons, we reverse the judgment of the circuit court.  

Plaintiffs are horse tracks that have conducted off-track wagering pursuant to inter-track wagering licenses received from the Board.  Plaintiffs had been paying a tax on 1% of the total bets, otherwise called the "pari-mutuel handle," on inter-track and simulcast wagering into the "Horse Racing Tax Allocation Fund" (HRTA Fund) pursuant to the Racing Act.  230 ILCS 5/26(h)(11)(B)(iii), (h)(11)(C) (West 1998).  Amounts in the fund were to be allocated by appropriation to various governmental entities including the Illinois Department of Agriculture, park districts, and municipalities.  230 ILCS 5/26(h)(11)(C) (West 1998).  The Racing Act further provided that the total amount of the HRTA Fund in any calendar year should not exceed the amount collected and distributed to the HRTA Fund in 1994.  230 ILCS 5/26(h)(11)(B)(iii) (West 1998).  Any monies exceeding 1994 levels were to be redistributed to the licensed horse tracks according to the amount they paid into the HRTA Fund and to race purses at the horse tracks.  230 ILCS 5/26(h)(11)(B)(iii) (West 1998).

Prior to 1999, plaintiffs allege that when they had paid an amount of tax equal to the 1994 HRTA Fund level, the Board directed plaintiffs to withhold further payment.  At the end of each year, the Board issued a determination of the proportion of tax owed by each plaintiff, along with other licensed horse tracks, and directed them to balance the accounts between themselves.  For example, an exhibit to the complaint, a 1998 letter written by the director of the Board to the licensees, stated: 

"As of Sunday, November 15, 1998, total Horse Race Tax Allocation Funds ('HRTA') generated under section 26 of the Horse Racing Act (230 ILCS 5/26) since January 1, 1998, exceeded the total HRTA collected in the calendar year 1994.  Pursuant to section 26(h)(11)(B) of the Act, HRTA funds generated on or after November 16, 1998 through and including December 31, 1998 must be re-allocated in calendar year 1999 among licensees and purse accounts in the manner set forth in the statute."  

The letter then directed the licensees to "cease making HRTA payments for race dates November 16, 1998 through December 31, 1998."

The Racing Act was amended in 1999 by Public Act 91-40 which was signed into law on June 25, 1999, and was to be effective on that date.  Pub. Act 91-40, eff. June 25, 1999 (1999 Ill. Laws 1184-1257).  Amendments included the addition of section 27(a)(5), which imposed a flat 1.5% "pari-mutuel tax" on the daily pari-mutuel handle from all monies bet at the race track from all sources.  
Pub. Act. 91-40, eff. June 25, 1999 (1999 Ill. Laws 1219-20). This tax, beginning on January 1, 2000, replaced a "privilege tax."   
Pub. Act. 91-40, eff. June 25, 1999 (1999 Ill. Laws 1219-20).  The "privilege tax," ending December 31, 1999, was a base 2% tax on the daily pari-mutuel handle with additional graduated privilege taxes on multiple wagers.  
Pub. Act. 91-40, eff. June 25, 1999 (1999 Ill. Laws 1219-20).  The amendments also included a "current year" and "immediate" "pari-mutuel tax credit" in section 32.1 that was available directly after the effective date of the statute.  
Balmoral Racing Club, Inc. v. Topinka
, 334 Ill. App. 3d 454, 460, 778 N.E.2d 239, 244 (2002) (construing Pub. Act 91-40, eff. June 25, 1999 (1999 Ill. Laws 1234-35) (adding 230 ILCS 5/32.1)).  

The Racing Act also retained language pertaining to the 1% tax on the pari-mutuel handle on inter-track and simulcast wagering and the accompanying redistribution language, but added the words "until January 1, 2000," to the provision.  Thus, the amendment provided: 

"From the sums permitted to be retained pursuant to this Act each inter-track wagering location licensee shall pay * * * (iii) 
until January 1, 2000
, except as provided in subsection (g) of Section 27 of this Act, 1% of the pari-mutuel handle wagered on inter-track wagering and simulcast wagering at each inter-track wagering location licensed facility to the Horse Racing Tax Allocation Fund, provided that, to the extent the total amount collected and distributed to the Horse Racing Tax Allocation Fund under this subsection (h) during any calendar year exceeds the amount collected and distributed to the Horse Racing Tax Allocation Fund during calendar year 1994, that excess amount shall be redistributed (I) to all inter-track wagering location licensees, based on each licensee's pro-rata share of the total handle from inter-track wagering and simulcast wagering for all inter-track wagering location licensees during the calendar year in which this provision is applicable[.]"  (Emphasis indicates added language) Pub. Act 91-40 (1999 Ill.Laws 1184-1257)

 230 ILCS 5/26(h)(11)(B) (West 2000). 

Public Act 91-40 also abolished the HRTA Fund, providing:

"(C) There is hereby created the Horse  Racing Tax Allocation  Fund 
which shall remain in existence until December 31, 1999.  Moneys remaining in the Fund after December 31, 1999 shall be paid into the General Revenue Fund.  Until January 1, 2000
, all monies paid into the Horse Racing Tax Allocation Fund pursuant to this paragraph (11) by inter-track wagering location licensees * * *  shall be allocated by appropriation as follows[.]" (emphasis indicates added language) Pub. Act 91-40, eff. June 25, 1999 (1999 Ill.Laws 1184-1257).

230 ILCS 5/26(h)(11)(C) (West 2000).  This section retained the previous Act's allocation scheme of the HRTA Fund to various governmental entities.  This section also set forth "[t]his subparagraph (C) shall be inoperative and of no force and effect on and after January 1, 2000."  230 ILCS 5/26(h)(11)(C) (West 2000).

The amendments also added section 28.1, which provided: 

"Beginning January 1, 2000, payments to all programs in existence on the effective date of this amendatory Act of 1999 that are identified in * * * 26(h)(11)(C) * * * shall be made from the General Revenue Fund at the funding levels determined by amounts paid under this Act in calendar year 1998."  Pub. Act 91-40 (1999 Ill. Laws 1184-1257)

 230 ILCS 5/28.1(d) (West 2000).

Plaintiffs allege that during 1999, each plaintiff made payment of 1% of the pari-mutuel handle of inter-track and simulcast wagering into the HRTA Fund.  When the 1994 limit had been reached, plaintiffs were required to continue making payments through the end of 1999.   The total amount paid by all horse tracks into the HRTA Fund was $5,793,168.00.  This resulted in a payment in the year 1999 of $786,286.00 in excess of the 1994 levels.

 Sometime after December 31, 1999, the deputy director of the Board advised plaintiffs that the Board would not make a redistribution from the HRTA Fund.  An April 25, 2000, letter from the deputy director to plaintiffs stated: 

"as you are aware, the Illinois Horse Racing Act was amended in June of 1999 resulting in sweeping changes to our racing statutes.  One component of the amendment included the repeal of the 1% HRTA tax, effective January 1, 2000.  Along with the repeal of the tax, was the elimination of the statutory mechanism mandating the redistribution of the HRTA funds in excess of those collected in 1994.  The General Assembly also authorized continued funding for HRTA programs at 1998 levels financed by the 'General Revenue Fund'.  In addition statutory language was added that required the transfer of the HRTA fund balance to the 'General Revenue Fund' after December 31, 1999 (26(h)(11)(c)).  In past years, under the previous administration, licensees were directed to temporarily retain the excess HRTA tax until the Board directive was issued directing the redistribution of such funds.  This past practice was in direct conflict with the clear language mandating that all HRTA taxes be remitted directly to the IRB.  Therefore, IRB policy allowing licensees to retain all HRTA taxes exceeding 1994 levels was discontinued in 1999.  With the 'sunset' of the redistribution language (26(h)(I)(B)) [
sic.
], and the specific language added directing the transfer of the HRTA funds after December 31, 1999 (26(h)(11)(6)) [
sic.
], a redistribution of HRTA funds collected in 1999 is not permitted." 

Plaintiffs allege that the 
pro rata
 share of the excess tax payment made by each plaintiff is $120,628.16 by Balmoral Racing Club, Inc., $173,395.83 by Hawthorne Race Course, Inc., $106,741.10 by Maywood Park Trotting Association, Inc., and $59,937.66 by Ogden Fairmount, Inc. 

On April 3, 2001, plaintiffs filed a complaint for declaratory judgment and other relief against the Board and Comptroller Daniel W. Hynes and Glen Brower, Director of the Illinois Department of Revenue.  On June 25, 2001, defendants filed a combined motion to dismiss pursuant to section 2-619.1 of the Code of Civil Procedure (735 ILCS 5/2-619.1 (West 2000)).  Plaintiffs then filed a first amended complaint for declaratory judgment and other relief which contained identical factual allegations, but named as defendants Ralph M. Gonzales, chairman of the Board, and Board members William J. Chamblin, William E. Jackson, James M. Kane, Joseph F. Kindlon, Louise E. O'Sullivan, William J. Parrillo, Lorna E. Propes, Leon Schlofrock, and John B. Simon; as well as Daniel W. Hynes and Glen Brower (defendants).

Plaintiffs prayed that the court enter a judgment: (1) declaring that the plaintiffs are entitled to reimbursement of excess funds paid into the HRTA Fund in 1999; (2) ordering defendants "to take such steps as are necessary to issue warrants to make payment to Plaintiffs in the amounts set forth above"; and (3) that plaintiffs have such other, further or different relief as the Court deems appropriate.  

The defendants moved to dismiss the complaint pursuant to sections 2-615 and 2-619 of the Code of Civil Procedure. 735 ILCS 5/2-615, 2-619 (West 2000).  Defendants argued the complaint was barred by sovereign immunity because it was an action against the State and should be brought in the Court of Claims.  The defendants also argued that the plain meaning of the amendments to the Racing Act did not allow for the funds collected throughout 1999 to be redistributed after January 1, 2000.   Defendants additionally argued that the voluntary payment of the taxes barred plaintiffs' cause of action.  

Plaintiffs responded by asserting their claim was not barred by sovereign immunity because it is an action against the defendants, who are acting in excess of their statutory authority, and not against the State because the State is presumed not to act in excess of its statutes.  Plaintiffs also argued that the proper interpretation of the amendments to the Racing Act entitles them to redistribution of their excess payments in 1999.  Plaintiffs lastly argued that the voluntary payment doctrine did not apply because plaintiffs did not erroneously pay the taxes, that  payment of taxes was made under duress, and that recovery of the taxes is authorized by statute.

On December 18, 2001, the circuit court dismissed the complaint pursuant to sections 2-615 and 2-619 with prejudice without stating its reasons.  Plaintiffs appeal.  Our review of a dismissal pursuant to both sections 2-615 and 2- 619 is 
de novo
, and we accept all well-pleaded facts in the complaint as true and draw all reasonable inferences from those facts in favor of the nonmoving party.  
Hanna v. City of Chicago
, 331 Ill. App. 3d 295, 303, 771 N.E.2d 13, 19 (2002).

We begin by addressing whether subject matter jurisdiction was conferred on the circuit court.  Defendants contend that the circuit court lacked power to grant the requested relief because this action was, in effect, a suit against the State and therefore could only be brought in the Court of Claims.  705 ILCS 5/1 (West 2000).  We disagree.  

A determination of whether a suit is brought against the State does not depend on the named parties but, rather, on the issues raised and the relief sought.  
Senn Park Nursing Center v. Miller
, 104 Ill. 2d 169, 186, 470 N.E.2d 1029, 1038 (1984); 
City of Springfield v. Allphin
, 74 Ill. 2d 117, 123, 384 N.E.2d 310, 312 (1978).  
"Where the issue is whether a State officer has refused to disburse appropriated funds according to law, and the relief sought is an injunction directing that those funds be released in accordance with the appropriation, the action is not one against the State."  
Allphin
, 74 Ill. 2d at 124, 384 N.E.2d at 312; 
see
 
also
 
Board of Trustees of Community College District No. 508 v. Burris
, 118 Ill. 2d 465, 473, 515 N.E.2d 1244, 1248 (1987)
; 
County of Cook v. Ogilvie
, 50 Ill. 2d 379, 383, 280 N.E.2d 224 (1972); 
E.H. Swenson & Son, Inc. v. Lorenz
, 36 Ill. 2d 382, 223 N.E.2d 147 (1967); 
Board of Education of Township High School District No. 206 v. Cronin
, 69 Ill. App. 3d 472, 475, 388 N.E.2d 72, 75 (1979).
  
This is because "'[t]he presumption obtains that the State, or a department thereof, will not, and does not, violate the constitution and laws of the State, but that such violation, if it occurs, is by a State officer or the head of a department of the State, and such officer or head may be restrained by a proper action instituted by a citizen.'" 
Allphin
, 74 Ill. 2d at 124, 384 N.E.2d at 313, quoting 
Schwing v. Miles
, 367 Ill. 436, 441-42, 11 N.E.2d 944, 947 (1937). 

We find 
City of Springfield v. Allphin
, 74 Ill. 2d 117, 384 N.E.2d 310 (1978), instructive.  In 
Allphin
, the Department of Revenue was empowered by statute to collect a tax on behalf of plaintiff municipalities.  A statutory formula called for the State to retain a specified percentage of the tax for the cost of collecting and administering the tax and the remainder was to be disbursed to the plaintiff municipalities.  The statute was then amended to reduce the State's share and a dispute arose as to when the statute was effective. The plaintiffs claimed the Director of the Department of Revenue wrongfully certified a higher amount to be withheld according to an incorrect interpretation of the statute, resulting in the State's wrongfully withholding approximately $3 million from the plaintiff municipalities.  
Allphin
, 74 Ill. 2d at 121-22, 384 N.E.2d at 311-12.  

The 
Allphin
 court concluded the action was not against the State where the issue involved the interpretation of the effective date of a statute and the relief requested was a declaratory judgment and reimbursement of certain funds from the State treasury.  
Allphin
 74 Ill. 2d at 126, 384 N.E.2d at 314.  The court rejected the argument that sovereign immunity barred the claim because granting of the requested relief would impact the State treasury.  
Allphin
, 74 Ill.2d at 126, 384 N.E.2d at 314.  The court stated that the action challenged the legality of the defendants' withholding of funds from plaintiffs, and, as such, was not a suit against the State.  The court also noted that "defendants' resort to 'self help,' in ordering the deposit of the disputed funds into the State's General Revenue Fund does not prohibit the courts from fashioning an appropriate form of relief." 
Allphin
, 74 Ill. 2d at 126, 384 N.E.2d at 314, quoting 
Swenson
, 36 Ill. 2d at 385, 223 N.E.2d at 149. Courts had such power to fashion relief even in the absence of an express statutory appropriation from the General Revenue Fund. 
Allphin
, 74 Ill.2d at 127, 384 N.E.2d at 314.  After interpreting the statute in favor of the plaintiff, the court remanded the case to the circuit court to grant plaintiffs leave to amend their complaint to define more precisely the tax revenue from which the plaintiffs could obtain reimbursement.  
Allphin
, 74 Ill. 2d at 131, 384 N.E.2d at 316. 

Like 
Allphin
, we reject defendants' argument that because the relief must necessarily impact the General Revenue Fund, and there is no statutory authority for return of those monies from the General Revenue Fund, that sovereign immunity bars the claim.  Similarly, the issue in this case is the interpretation of a statute, and the relief requested is a declaratory judgment and the reimbursement of allegedly wrongfully withheld taxes.  Defendants here also resorted to "self help" by depositing the disputed funds into the General Revenue Fund.  As such, the plaintiffs' suit is not one against the State, but is one that contests the conduct of State officials in allegedly proceeding in contravention of their duties under the Racing Act.  Such action is within the jurisdiction of the circuit court.  

We next consider whether the amendments to the Racing Act allowed the redistribution of HRTA Fund amounts in excess of 1994 levels to plaintiffs.   The cardinal rule of statutory interpretation, to which all other rules are subordinate, is to ascertain and give effect to the intention of the legislature.  
People v. Maggette
, 195 Ill. 2d 336, 348, 747 N.E.2d 339, 346 (2001).  To this end, a court must first consider the statutory language, which is the best means of determining legislative intent.  
Maggette
, 195 Ill. 2d at 348, 747 N.E.2d at 346.  
Where an enactment is clear and unambiguous, the court is not free to depart from the plain language and meaning of the statute by reading into it exceptions, limitations, or conditions that the legislature did not express.  
People v. Woodard
, 175 Ill. 2d 435, 443, 677 N.E.2d 935, 939 (1997).  It is not necessary for the court to search for any subtle or not readily apparent intention of the legislature.  
Woodard
, 175 Ill. 2d at 443, 677 N.E.2d at 939.  A court should construe a statute, if possible to give effect to each paragraph, sentence, clause, and word.  
Maggette
, 195 Ill. 2d at 350, 747 N.E.2d at 347
.  Where the language is clear and unambiguous, it will be given effect without resort to other aids for construction. 
Woodward
, 175 Ill.2d at 443, 677 N.E.2d at 939.   Because we find the redistribution language to be clear and unambiguous, we do not turn to other tools of statutory construction.

The Racing Act expressly provides "until January 1, 2000
 * * * to the extent the total amount collected and distributed to the Horse Racing Tax Allocation Fund under this subsection (h) during any calendar year exceeds the amount collected and distributed to the Horse Racing Tax Allocation Fund during calendar year 1994, that excess amount 
shall
 be redistributed[.]" (emphasis added.) 230 ILCS 5/26(h)(11)(B)(iii) (West 2000).  Because the amount collected in 1999 allegedly exceeds that collected in 1994, the statute unambiguously requires "that excess amount shall be redistributed."  230 ILCS 5/26(h)(11)(B)(iii) (West 2000). 

Defendants read sections 26(h)(11)(B)(iii) and 26(h)(11)(C) (230 ILCS 5/26(h)(11)(B)(iii), 26(h)(11)(C) (West 2000)) as requiring plaintiffs to pay the tax for the entire year 1999, but absolving defendants of their duty to redistribute.  Defendants assert section 26(h)(11)(B)(iii) defines the redistribution in terms of "the total amount collected and distributed . . . during any calendar year."  230 ILCS 5/26(h)(11)(B)(iii) (West 2000).  Because the "total amount" collected in a year cannot be calculated until January 1, 2000, or, as defendants conceded at oral argument, after the last race on December 31, 1999, Public Act 91-40 eliminated the authority to redistribute on January 1, 2000.  Furthermore, defendants contend section 26(h)(11)(B) allowed only redistribution from the HRTA Fund, which was abolished on December 31, 1999, by section 26(h)(11)(C).  Therefore, defendants state, they were not statutorily authorized to redistribute the excess funds.  We do not accept this interpretation.   

 First, this interpretation results in an actual increase of the tax assessed against plaintiffs in the face of the clear expression of the legislature that the funds are to be redistributed.  We reject defendants' implication that the legislature intended to subtly increase the tax in this manner, when it could have simply removed the redistribution language.  Furthermore, to adopt the defendants' interpretation would render the redistribution language superfluous and violates the rule that a court should construe a statute, if possible, to give effect to each paragraph, sentence, clause, and word.  
Maggette
, 195 Ill. 2d at 350, 747 N.E.2d at 347
.  

We therefore reject defendants' argument that the "total amount" must be calculated before redistribution may be made, and this calculation must be made after the new tax scheme had begun.  The Board had previously made a practical redistribution of the monies before the end of the year by ordering a cessation of the payments because the amount in excess of the 1994 level is ascertainable prior to the end of the year.  The plaintiffs had been paying the money throughout the year of 1999; therefore, the Board could have calculated that the total amount exceeded1994 level as soon as the HRTA Fund reached the 1994 cap.  It was not necessary to wait for the total amount for the whole calendar year to spill over that cap to know there would be an excess. Furthermore, as defendants concede, under their interpretation, the calculations can theoretically be made on December 31, 1999, after the receipts had been submitted to the Racing Board.  Thus, the redistribution could also have theoretically been made in 1999.  

We therefore find that the legislature's amendments which became effective on June 25, 1999, left in place the tax scheme on inter-track and simulcast wagering which was based on payment and redistribution during the full calendar year, and then simply terminated the tax beginning on January 1, 2000.  This interpretation is consistent with the legislature's amendments to the tax on the pari-mutuel handle from all sources elsewhere in the Racing Act.  230 ILCS 5/27(a), 27(a-5), 32.1 (West 2000).  These amendments provided for an end of the "privilege tax" on December 31, 1999, the beginning of the "pari-mutuel tax" on January 1, 2000, and the "current" and "immediate" pari-mutuel tax credit in the interim period between the effective date of the Racing Act on June 25, 1999, and the beginning of the new tax scheme on January 1, 2000.  
Balmoral Racing Club, Inc.
, 334 Ill. App. 3d at 460, 778 N.E.2d at 244 (citing Pub. Act. 91-40, eff. June 25, 1999 (1999 Ill. Laws 1219-20, 1234-35)).  As shown by these amendments, the legislature could have expressly provided for an interim provision, such as that found in section 32.1 (230 ILCS 5/32.1 (West 2000)), if it intended to change the scheme in the interim period after the effective date of the statute and the beginning of the new tax scheme.

Our interpretation is also consistent with section 28.1(d) of the Racing Act.  230 ILCS 5/28.1(d) (West 2000).  This section states, "[b]eginning January 1, 2000, payments to all programs in existence on the effective date of this amendatory Act of 1999 that are identified in * * * 26(h)(11)(C) * * * shall be made from the General Revenue Fund at the funding levels determined by amounts paid under this Act in calendar year 1998."  230 ILCS 5/28.1(d) (West 2000).  As stated earlier, section 26(h)(11)(C) allocated moneys from the HRTA Fund to various governmental entities including the Illinois Department of Agriculture, park districts, and municipalities. 230 ILCS 5/26(h)(11)(C) (West 2000).  When applied specifically to section 26(h)(11)(C), the 1998 levels necessarily equaled 1994.  Therefore, the legislature provided for the appropriation of the funds that remained in the HRTA Fund at the 1994 level.  As shown in supplemental briefs provided by the parties to this court, the fiscal year 2000 budget allocations for the governmental entities under this program such as the Department of Agriculture remained at essentially the same levels as 1994, rather than at an elevated level due to the excess funds.  While not dispositive of the issue at hand, this supports the conclusion that the 1994 cap was still applicable to the moneys in the HRTA Fund in 1999.  Defendants point to no provision that appropriates monies in excess of the 1994 cap.  Rather, the only appropriation language for that excess money was by redistribution to the licensees in section 26(h)(11)(B)(iii), rather to government programs from the General Revenue Fund.

We also reject defendants' argument that because the racing industry gained numerous other advantages from Public Act 91-40, the redistribution of the 1999 excess monies represents a windfall to the industry unintended by the legislature.  This invitation to pragmatically second-guess the legislature's policy judgment is a task for which the court is ill-suited.  In this matter, the legislature is in the better position to balance the societal and fiscal consequences of tax legislation concerning the economically and politically complex racing and gambling industry.  As such, nullification of the redistribution language is beyond the bounds of judicial authority.

We also hold that the voluntary payment doctrine does not bar repayment to the plaintiffs.  As defendants concede, this doctrine precludes recovery of taxes voluntarily paid, except when a statute authorizes such recovery.  
Freund v. Avis Rent-A-Car System, Inc.
, 114 Ill. 2d 73, 499 N.E.2d 473 (1986); 
Sullivan v. Board of Commissioners of Oak Lawn Park District
, 318 Ill. App. 3d 1067, 743 N.E.2d 107 (2001).   As decided above, the Racing Act authorizes recovery.  

As a final matter, plaintiffs request that upon remand, they be allowed to amend their complaint consistent with the 
Allphin
 opinion to allow a possible reimbursement from future taxes owed to the State.  
Allphin
, 74 Ill. 2d at 130, 384 N.E.2d at 316. Although the particular withholding scheme at issue here is no longer in force, the court retains the power to fashion an appropriate equitable remedy in the absence of specific statutory authority.  
Allphin
, 74 Ill. 2d at 127, 384 N.E.2d at 314.  We direct that, upon remand, the circuit court grant plaintiffs leave to amend their complaint consistent with the 
Allphin
 decision.  
Allphin
, 74 Ill. 2d at 131, 384 N.E.2d at 316.    

The judgment of the circuit court of Cook County is reversed and the cause remanded to the circuit court with directions.  

Reversed and remanded with directions.

HARTMAN and GREIMAN, J.J., concur.