# Illinois Official Reports

## Appellate Court

> ### *Cahokia Unit School District No. 187 v. Pritzker*, 2020 IL App (5th) 180542

| | |
|---|---|
| Appellate Court Caption | CAHOKIA UNIT SCHOOL DISTRICT NO. 187, GRANT CENTRAL CONSOLIDATED SCHOOL DISTRICT NO. 110, PANA COMMUNITY UNIT SCHOOL DISTRICT NO. 8, BETHALTO COMMUNITY UNIT SCHOOL DISTRICT NO. 8, BOND COUNTY COMMUNITY UNIT SCHOOL DISTRICT NO. 2, BROWNSTOWN COMMUNITY UNIT SCHOOL DISTRICT 201, BUNKER HILL COMMUNITY UNIT SCHOOL DISTRICT NO. 8, GILLESPIE COMMUNITY UNIT SCHOOL DISTRICT NO. 7, ILLINOIS VALLEY CENTRAL COMMUNITY UNIT SCHOOL DISTRICT NO. 321, MERIDIAN COMMUNITY UNIT SCHOOL DISTRICT 223, MT. OLIVE COMMUNITY UNIT SCHOOL DISTRICT NO. 5, MULBERRY GROVE COMMUNITY UNIT SCHOOL DISTRICT NO. 1, NOKOMIS COMMUNITY UNIT SCHOOL DISTRICT NO. 22, OSWEGO COMMUNITY UNIT SCHOOL DISTRICT 308, OREGON COMMUNITY UNIT SCHOOL DISTRICT 220, SOUTHWESTERN COMMUNITY UNIT SCHOOL DISTRICT 9, STAUNTON COMMUNITY UNIT SCHOOL DISTRICT NO. 6, STREATOR TOWNSHIP HIGH SCHOOL DISTRICT 40, VANDALIA COMMUNITY UNIT SCHOOL DISTRICT NO. 203, WOOD RIVER-HARTFORD SCHOOL DISTRICT NO. 15, CARLINVILLE COMMUNITY UNIT SCHOOL DISTRICT NO. 1, and TAYLORVILLE COMMUNITY UNIT SCHOOL DISTRICT NO. 3, Plaintiffs-Appellants, v. J.B. PRITZKER,* Governor of the State of Illinois, and THE STATE OF ILLINOIS, Defendants-Appellees. |
| District & No. | Fifth District<br>No. 5-18-0542 |

---

*This action was originally brought against Bruce Rauner in his official capacity as Governor of the State of Illinois. Pursuant to section 2-1008(d) of the Code of Civil Procedure (735 ILCS 5/2-1008(d) (West 2018)), we have changed the caption to reflect that the Governor is now J.B. Pritzker, who has been substituted as a defendant as a matter of law.

| | |
|---|---|
| Rule 23 order filed<br>Motion to publish | April 17, 2020 |
| allowed | May 13, 2020 |
| Opinion filed | May 13, 2020 |

| | |
|---|---|
| Decision Under<br>Review | Appeal from the Circuit Court of St. Clair County, No. 17-CH-301; the Hon. Julie K. Katz, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on<br>Appeal | Thomas H. Geoghegan, Michael P. Persoon, and Will W. Bloom, of Despres, Schwartz & Geoghegan, Ltd., of Chicago, for appellants.<br><br>Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Richard S. Huszagh, Assistant Attorney General, of counsel), for appellees. |
| Panel | JUSTICE MOORE delivered the judgment of the court, with opinion.<br>Presiding Justice Welch concurred in the judgment and opinion.<br>Justice Wharton concurred in part and dissented in part, with opinion. |

**OPINION**

¶ 1 The plaintiffs, comprising 22 school districts, appeal the October 17, 2018, order of the circuit court of St. Clair County, which dismissed with prejudice their complaint against the defendants, J.B. Pritzker, Governor of the State of Illinois, and the State of Illinois. For the following reasons, we affirm.

¶ 2 FACTS

¶ 3 The plaintiffs filed a first amended complaint against the defendants on May 21, 2018. We set forth the allegations of this complaint in detail, as they are to be taken as true for the purposes of our analysis. The plaintiffs are school districts located in St. Clair, Bond, Christian, Fayette, Jersey, Macoupin, Madison, Montgomery, and Peoria Counties. In 1997, the Illinois State Board of Education (ISBE) adopted the Illinois Learning Standards (Learning Standards), representing skills that Illinois students must demonstrate at different grade levels, especially in the areas of English and mathematics. According to the complaint, the Learning Standards

have been revised and expanded over the years with more specific benchmarks imposed on the plaintiffs to ensure students meet the Learning Standards. This included the adoption of Common Core State Standards for English, language arts, and mathematics, which was required by statute. See 105 ILCS 5/2-3.64a-5 (West 2016). Pursuant to statute, the Learning Standards have been developed with significant public outreach and comment. See *id.* Accordingly, as per the complaint, the Learning Standards represent "a consensus of the citizens of Illinois as to an appropriate 'high quality' education for purposes of Article X, Section 1 of the Illinois Constitution." Ill. Const. 1970, art. X, § 1.

¶ 4        The complaint sets forth specific details outlining the ways the plaintiffs are being held accountable for the Learning Standards without adequate funding to meet them. This includes assessments of students, including the use of the Partnership for Assessment of Readiness for College and Careers (PARCC) examination for high school students, which is used as one factor to determine whether students are admitted to Illinois colleges and universities. According to the complaint, for all of the plaintiff districts, the combined state and local revenue per pupil is below the average of all districts in the State, and far below that of the districts in the top fifth of local resources per pupil. The complaint sets forth detailed tables illustrating the correlation between this disparity in funding and the disparity between the plaintiffs and other districts in the State in achieving the Learning Standards. According to the complaint, this situation led the General Assembly to enact Public Act 100-465 (eff. Aug. 31, 2017), the Evidence-Based Funding for Student Success Act (Funding Act). 105 ILCS 5/18-8.15 (West 2018).

¶ 5        According to the complaint, the Funding Act allows for the calculation of specific additional amounts of funding necessary for underresourced districts to meet or achieve the Learning Standards. *Id.* The formula set forth in the Funding Act provides for these districts to have the priority in allocating additional funding, although other, more affluent districts retain the same State aid they received before. *Id.* The complaint sets forth in detail how this formula works to allow ISBE to determine the appropriate share of additional funding that each district shall receive in order to achieve a "high quality" education for students. According to the complaint, the Funding Act expressly adopts a goal of meeting the adequacy targets for the plaintiffs and other underresourced districts by June 30, 2027. *Id.* The complaint alleges that, at the then-current funding rate of $350 million a year, there is no possibility the State will meet this goal.

¶ 6        Count I of the complaint alleges that ISBE has calculated that the State must spend an additional $7.2 billion, or a total of $15.7 billion, annually in order to provide students with the "high quality" education required by article X of the Illinois Constitution. Ill. Const. 1970, art. X. Accordingly, count I alleges that, in violation of the rights of the plaintiffs and their students under article X, section 1 (*id.* § 1), the State has unlawfully failed to provide the funding necessary for the plaintiffs to achieve the Learning Standards. In addition, count I alleges that the Governor has also exceeded his lawful authority by "operating a public education system that operates in an unconstitutional manner." Finally, count I alleges that the plaintiffs and their students will suffer irreparable injury every year that the students of the plaintiffs advance to another grade that denies them the fair opportunity, as determined by the State through ISBE, to achieve the Learning Standards and to enjoy their right to a high quality education under article X, section 1. *Id.*

¶ 7 Count II of the complaint alleges that the disparities in per pupil expenditures across the school districts of Illinois, ranging as high as $10,000 to $15,000 per student, have no legitimate basis in the law. According to count II of the complaint, such disparities "can no longer be justified as an acceptable consequence of the State's goal of local control over local educational effort when in recent years the State has significantly displaced local control by imposing the Learning Standards." Count II alleges that, by operating "such an unconstitutional system of public education," the Governor has exceeded his lawful authority and the State has deprived the plaintiffs and their students of the right to equal protection of the laws, in violation of article I, section 2, of the Illinois Constitution. Ill. Const. 1970, art. I, § 2. Count I and count II of the complaint set forth identical prayers for relief, which we quote here due to some confusion in the briefing on this issue:

"A. Declare that under Article I, Section 2, as well as under Article X, Section 1, the State defendants have a constitutional obligation to provide to the plaintiff districts the funding determined by ISBE and pursuant to the 2017 Evidence Based Act to be necessary to meet or achieve the Learning Standards and to reach the adequacy targets set forth pursuant to the 2017 Evidence Based Funding Act.

B. Enter judgment on behalf of the plaintiff districts and against the State defendants for the amounts determined to be necessary by ISBE to meet or achieve the Learning Standards and to reach the adequacy targets set forth pursuant to the Evidence Based Funding Act.

C. Retain jurisdiction to enforce such schedule of payments and take additional measures in whatever manner the [c]ourt deems appropriate for the State defendants to comply with this judgment.

D. Grant [the] plaintiffs their legal fees and costs, pursuant to Section 5 of the Illinois Civil Rights Act of 2003 [(740 ILCS 23/5 (West 2018))], for claims arising under the Illinois Constitution."

¶ 8 On July 20, 2018, the defendants filed a motion to dismiss the complaint pursuant to section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2018)). Pursuant to section 2-619(a)(1) of the Code (*id.* § 2-619(a)(1)), the defendants asserted that this action is barred by the doctrine of sovereign immunity and that the plaintiffs lack standing to assert the rights of their students. Pursuant to section 2-615 of the Code (*id.* § 2-615), the defendants asserted that both count I and count II fail to state a cause of action for a deprivation of the plaintiffs' constitutional rights and the Governor could not effectuate the relief the plaintiffs requested in the complaint.

¶ 9 On August 24, 2018, the plaintiffs filed a response to the defendants' motion to dismiss. Inexplicably, in the response, the plaintiffs stated that they were seeking the following relief, which is different than that set forth in either the original complaint or the amended complaint:

"A. A declaratory judgment that in violation of Article X, section 1 and Article I, section 2 of the Illinois Constitution, the defendants have deprived the plaintiff districts and their students of their rights to a high quality education as specified by the Learning Standards.

B. An [o]rder that the State defendants submit a schedule for additional State aid to the plaintiff districts setting out how the defendants will meet their legislatively stated goal of fully funding the Learning Standards by June 30, 2027.

C. Grant such other relief as may be necessary to ensure that the State sets aside or makes available the necessary funds to adhere to this schedule.

D. Order the State defendants to modify as appropriate the use of the PARCC examinations, which currently penalize students in low wealth districts when they apply for admission to State institutions of higher education."

¶ 10 On October 2, 2018, the circuit court held a hearing on the defendants' motion to dismiss the complaint and took the matter under advisement. On October 17, 2018, the circuit court entered an order granting the defendants' motion and dismissing the complaint with prejudice. On November 13, 2018, the plaintiffs filed a timely notice of appeal.

¶ 11 ANALYSIS

¶ 12 The defendants brought their motion to dismiss the plaintiffs' complaint pursuant to section 2-619.1 of the Code (735 ILCS 5/2-619.1 (West 2018)), which allows a party to file a motion combining a motion to dismiss pursuant to section 2-615 of the Code (*id.* § 2-615) with a motion to dismiss under section 2-619 of the Code (*id.* § 2-619). We review the circuit court's order dismissing the complaint under these sections of the Code *de novo*. *Schloss v. Jumper*, 2014 IL App (4th) 121086, ¶ 15.

¶ 13 1. The State of Illinois as Defendant

¶ 14 At the outset, we address the propriety of the circuit court's order dismissing both counts of the complaint as stated against the State of Illinois. The Illinois Supreme Court has summarized the law governing lawsuits against the State of Illinois as follows:

"The doctrine of sovereign immunity 'protects the State from interference in its performance of the functions of government and preserves its control over State coffers.' [Citation.] The Illinois Constitution of 1970 abolished sovereign immunity '[e]xcept as the General Assembly may provide by law.' Ill. Const. 1970, art. XIII, § 4. Pursuant to this constitutional authorization, the General Assembly subsequently reestablished sovereign immunity by enacting the State Lawsuit Immunity Act, which provides that 'the State of Illinois shall not be named [as] a defendant or party in any court,' except as provided in the Court of Claims Act (705 ILCS 505/1 *et seq.* (West 2008)) and in several other statutes not pertinent here. 745 ILCS 5/1 (West 2008). The Court of Claims Act, in turn, established the Court of Claims as the exclusive forum for litigants to pursue claims against the State. 705 ILCS 505/8 (West 2008)." *Township of Jubilee v. State of Illinois*, 2011 IL 111447, ¶ 22.

¶ 15 In their brief on appeal, the plaintiffs present arguments as to the propriety of maintaining an action against the Governor in his official capacity but cite no authority and make no argument as to why the above-referenced principles of sovereign immunity do not apply to the plaintiffs' claims as stated directly against the State of Illinois. Irrespective of the merits of the plaintiffs' argument in favor of the circuit court's jurisdiction to entertain their claims against the Governor, we find nothing in the law that would allow the plaintiffs to pursue claims against the State of Illinois itself in the circuit court. Accordingly, we affirm the dismissal of the plaintiffs' complaint insofar as it is requesting relief from the State of Illinois as a defendant.

¶ 16                                    2. The Governor as Defendant

¶ 17        This appeal raises issues as to whether the doctrine of sovereign immunity bars this action as stated against the Governor. The plaintiffs argue that the "officer suit" exception to the sovereign immunity doctrine would operate to allow their suit against the Governor to move forward. See, *e.g.*, *Parmar v. Madigan*, 2018 IL 122265, ¶ 22 (where a plaintiff alleges that a State officer's conduct violates statutory or constitutional law or is in excess of his or her authority, such conduct is not regarded as the conduct of the State for sovereign immunity purposes). The defendants counter that the Governor is an improper party in this action because he does not have the power to effectuate the relief that the plaintiffs are requesting. See, *e.g.*, *Illinois Press Ass'n v. Ryan*, 195 Ill. 2d 63, 67-68 (2001) (governor was an improper party to a suit for declaratory relief due to the absence of a connection between governor and the subject of the suit such that governor had no power to effectuate judgment). Assuming, without deciding, that the Governor would be a proper party against whom the plaintiffs could bring their claims, we turn to the substance of the claims themselves to determine whether the circuit court erred in determining the plaintiffs could not proceed.

¶ 18                              a. *Count I—The Quality Education Clause*

¶ 19        Count I of the complaint alleges that the defendants have violated article X, section 1, of the Illinois Constitution (quality education clause) (Ill. Const. 1970, art. X, § 1), which states that "[t]he State shall provide for an efficient system of high quality public educational institutions and services." Assuming the plaintiffs have standing to bring a claim to enforce the quality education clause, we find that the doctrine of *stare decisis* compels us to affirm the order of the circuit court dismissing count I with prejudice. Our supreme court has explained the role *stare decisis* is to play in our judicial process as follows:

> "The doctrine of *stare decisis* 'expresses the policy of the courts to stand by precedents and not to disturb settled points.' [Citation.] This doctrine 'is the means by which courts ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion.' [Citation.] *Stare decisis* enables both the people and the bar of this state 'to rely upon [the supreme court's] decisions with assurance that they will not be lightly overruled.' [Citation.]" *Vitro v. Mihelcic*, 209 Ill. 2d 76, 81-82 (2004).

¶ 20        In *Committee for Educational Rights v. Edgar*, 174 Ill. 2d 1 (1996), the Illinois Supreme Court considered the request of school districts, school boards, and students for a declaratory judgment against the governor and ISBE that the then-current system for financing public schools violated the quality education clause. The court concluded that the question of whether educational institutions and services in Illinois are "high quality" is outside the sphere of judicial function. *Id.* at 32. That holding was reaffirmed in *Lewis v. Spagnolo*, 186 Ill. 2d 198, 210 (1999), where the court found that the plaintiffs, students in that case, could not state a claim based upon a violation of the quality education clause.

¶ 21        The plaintiffs argue that the reasoning set forth by the court in *Edgar* is no longer applicable because the ISBE has defined a quality education through adoption of the Learning Standards and the General Assembly has defined what funding is required under the quality education clause by enacting the Funding Act. 105 ILCS 5/18-8.15 (West 2018). However, the plaintiffs do not seek to state a cause of action for enforcement of the Funding Act itself but rather are asking this court to overturn *Edgar*'s holding based on the definition of quality to be gleaned from the Funding Act and the Learning Standards. While we agree that some of the reasoning

- 6 -

in *Edgar* focused on the lack of measurability of "quality," the ultimate holding in *Edgar* was broadly stated, concluding that the determination of whether the State was fulfilling its duty of providing for a quality education was outside the judicial function. *Edgar*, 174 Ill. 2d at 32. More recently, *Edgar*'s holding was again broadly stated in *Lewis*, where the supreme court reinforced its prior decision finding there was no cause of action for violation of the quality education clause. *Lewis*, 186 Ill. 2d at 210.

¶ 22　　Recently, the Illinois Supreme Court reiterated the long-standing principle that our circuit and appellate courts are bound to apply supreme court precedent to the facts of the case before them, "[r]egardless of the impact of any societal evolution that may have occurred" since the decision was made. *Yakich v. Aulds*, 2019 IL 123667, ¶ 13. The court cautioned the appellate court that " '[w]hen th[e supreme] court "has declared the law on any point, *it alone can overrule and modify its previous opinion*, and the lower judicial tribunals are bound by such decision and it is the duty of such lower tribunals to follow such decisions in similar cases." ' " (Emphasis in original.). *Id.* (quoting *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 61, quoting *Price v. Philip Morris, Inc.*, 2015 IL 117687, ¶ 38). Bearing this in mind, we decline to disturb the holdings in *Edgar* and *Lewis*, and we find that count I was properly dismissed.

¶ 23　　　　　　　　　　b. *Count II—The Equal Protection Clause*

¶ 24　　Count II of the plaintiffs' complaint alleges that the defendants' failure to fund the plaintiffs in the manner set forth in the Funding Act has resulted in disparities among school districts that constitute a violation of the equal protection clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). As with count I, our review of the circuit court's dismissal of count II is governed by the supreme court's decision in *Edgar*, 174 Ill. 2d at 40. Considering this exact claim, our supreme court held that the State's system of funding public education is rationally related to the legitimate State goal of promoting local control. *Id.* Accordingly, the court held that the circuit court properly dismissed the plaintiffs' claims alleging a violation of the equal protection clause based on disparities in educational funding. The plaintiffs argue that the adoption of the Learning Standards and the passage of the Funding Act illustrates a change in the goal of the State away from local control. However, based on the supreme court's recent pronouncement in *Yakich*, as described above, we find that it is for the supreme court to determine whether to alter the holding of *Edgar*. For these reasons, the circuit court properly dismissed count II of the plaintiffs' complaint.

¶ 25　　　　　　　　　　　　　CONCLUSION

¶ 26　　For the foregoing reasons, we affirm the October 17, 2018, order of the circuit court, which dismissed the plaintiffs' complaint with prejudice.

¶ 27　　Affirmed.

¶ 28　　JUSTICE WHARTON, concurring in part and dissenting in part:

¶ 29　　I concur with the majority's conclusion that the State of Illinois enjoys sovereign immunity and cannot be required to defend this lawsuit. *Township of Jubilee v. State of Illinois*, 2011 IL 111447, ¶ 22. I agree that the trial court's order dismissing the State as a defendant should be affirmed.

¶ 30	However, I respectfully disagree with the majority's affirmation of the trial court's premature dismissal and its conclusion that the Illinois Governor cannot be held accountable for violating both the quality education clause and the equal protection clause of the Illinois Constitution. My colleagues hold that this court is constrained to follow the precedent set in *Committee for Educational Rights v. Edgar*, 174 Ill. 2d 1 (1996), unless and until the Illinois Supreme Court reconsiders that holding. I dissent because I believe that we have a duty to address the education quality and funding issues presented by the 22 plaintiffs instead of ignoring or postponing this critical issue of utmost urgency and importance to our citizens and our State with an overly broad application of *Edgar*'s holding. While our supreme court has stated that case precedents must be applied "[r]egardless of the impact of any societal evolution that may have occurred," the issues in this case do not focus on "societal evolution"; instead, this case involves legislative evolution that has modified and established a *de facto* definition of the constitutionally mandated "quality education." *Yakich v. Aulds*, 2019 IL 123667, ¶ 13.

¶ 31	I will first address the issue involving the quality education clause as set forth in our constitution. Section 1 of article X of the Illinois Constitution of 1970 provides:

> "A fundamental goal of the People of the State is the educational development of all persons to the limits of their capacities.

> The State shall provide for an efficient system of high quality public educational institutions and services. Education in public schools through the secondary level shall be free. There may be such other free education as the General Assembly provides by law.

> The State has the primary responsibility for financing the system of public education." Ill. Const. 1970, art. X, § 1.

In *Committee for Educational Rights v. Edgar*, the Illinois Supreme Court noted that the education committee of the Sixth Illinois Constitutional Convention was partially guided by the United States Supreme Court's decision *Brown v. Board of Education*, 347 U.S. 483, 494 (1954)*. Edgar*, 174 Ill. 2d at 14-15. The education committee stated that " '[t]he opportunity for an education, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.' " *Id.* at 15 (quoting 6 Record of Proceedings, Sixth Illinois Constitutional Convention 231).

¶ 32	The Illinois Supreme Court explained that, while the term "quality education" was not defined within the constitution, the framers of the 1970 constitution purposefully chose not to define the term and believed that the definition would mean " 'different things to different people.' " *Id.* at 27 (quoting 2 Record of Proceedings, Sixth Illinois Constitutional Convention 767). The constitutional framers determined that what constituted a "quality education" should be decided by the legislature and the local school districts. *Id.* In considering whether the quality education clause gives rise to a cause of action, the *Edgar* court explained that "the central issue is whether the quality of education is capable of or properly subject to measurement by the courts." *Id.* at 24. The court answered that question in the negative, finding that questions related to the quality of education are best resolved by the legislature rather than the courts. *Id.* In part, the court reached this conclusion due to Illinois courts' long-standing history of giving deference to the legislature in matters related to education. See *id.* at 24-26. Noting that education is a subject outside of the court's expertise, the supreme court stated that, if it held "that the question of educational quality is subject to judicial determination[, that]

would largely deprive the members of the general public of a voice in a matter which is close to the hearts of all individuals in Illinois." *Id.* at 29.

¶ 33    When the supreme court decided *Edgar*, it was impossible for courts to address alleged violations of the quality education clause without first determining what type of education constituted a quality education because there was no legislative answer to that question. See *id.* at 26 (explaining that the state constitution does not define "quality education" (citing *Richards v. Raymond*, 92 Ill. 612, 617-18 (1879))).

¶ 34    In the 24 years subsequent to the *Edgar* decision, our legislature modified and expanded the requirements all Illinois schools must enact and employ in educating students. The legislature adopted legislation requiring the Illinois State Board of Education (ISBE) to establish academic standards for all Illinois public school students to meet. See 105 ILCS 5/2-3.64a-5(b) (West 2016). The legislation also requires the ISBE to assess public school students annually to determine whether those standards are being met. See *id.* § 2-3.64a-5(c). In 1997, the ISBE adopted the Illinois Learning Standards. "The Illinois Learning Standards establish expectations for what all students should know and be able to do in each subject at each grade." Ill. State Bd. of Ed., https://www.isbe.net/Pages/Learning-Standards.aspx (last visited July 21, 2020) [https://perma.cc/X6NK-5K8R]. "The standards emphasize depth over breadth, building upon key concepts as students advance." *Id.* "The standards promote student-driven learning and the application of knowledge to real world situations to help students develop deep conceptual understanding." *Id.* "Intentionally rigorous, the Illinois Learning Standards prepare students for the challenges of college and career." *Id.* The ISBE has periodically revised and expanded those standards to include the administrative adoption of the Common Core standards.

¶ 35    Thus, Illinois schools have been required to adjust curriculums to ensure inclusion of material to meet legislative and administrative standards in mathematics, English, and language arts. The ISBE stops short of setting the precise curriculum to follow, leaving those specific methodology decisions to the school districts, but the ISBE does set the standards in terms of topics to be included and the concepts that the students must learn. In addition, the districts and its educators are held accountable to meet these standards. Illinois students must take tests, including the Partnership for Assessment of Readiness for College and Careers assessment to measure students' progress towards college and career readiness in grades three through eight and in high school.

¶ 36    Overall, I find that the legislature has modified the original balance between the goals of ensuring a quality education for all Illinois students and promoting local control of schools as was in application when *Edgar* was decided. As a result, much of the control that local school boards once enjoyed has been shifted to the State. To the extent local control remains a viable consideration, I would find that the plaintiffs only plead for adequate educational funding resources to exercise some degree of "local control."

¶ 37    As stated earlier, the report prepared by the education committee of the Sixth Illinois Constitutional Convention began with the premise that the mandated education must be on equal terms. I find that what began in 1970 with the ideal of equal treatment stemming from *Brown v. Board of Education* has transitioned to unequal treatment for schools like the plaintiffs in this case. This inequality in State-provided education is further exacerbated because the current state of the law gives underresourced school districts no recourse to attempt to enforce the Funding Act on behalf of their students.

¶ 38 In *Brown v. Board of Education*, 347 U.S. 483, 484 (1954), the United States Supreme Court recognized that separating the children by race for educational purposes had a detrimental effect on the black children who felt inferior and were less motivated to learn. The combination of the underfunding alleged by the plaintiffs and the State-mandated education and testing requirements has a similar detrimental effect on the students of the rural and urban schools involved in this case. Academic underperformance by a school district impacts the lives of its students, who may encounter difficulties when applying for admission to postsecondary educational institutions. This outcome, based in part on the results of the skills assessment and accountability mandates, is contrary to our State's goal of providing quality education to all Illinois students. As an example, I highlight the makeup of the Cahokia Unit School District No. 187 as of the 2018-19 school year. The district is comprised of 89% black students. Ill. Report Card 2018-2019, https://www.illinoisreportcard.com/district.aspx?source=studentcharacteristics&Districtid=50082187026 (last visited July 21, 2020) [https://perma.cc/CFY7-P4TT]. Children living in a low-income situation make up 93% of the total of all Cahokia students. *Id.* Seven of its ten schools are academically underperforming. *Id.* Further aggravating the issue of inadequate funding is the fact that the State's school funding formula considers attendance and the Cahokia district has a chronic absenteeism rate of 50% for the entire district and 60% at the high school level. *Id.* Cahokia High School also has a 64% chronic truancy rate. *Id.* Based upon the State assessments, the students of Cahokia are not receiving the education required by the legislature and the ISBE administrative regulations. The cycle of low academic achievement will perpetuate year after year if changes are not made.

¶ 39 The United States Supreme Court's statement about education in 1954 is more important and applicable to modern-day education. The Court stated:

"Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms." *Brown*, 347 U.S. at 493.

It is important to note that the United States Supreme Court, although rendering a landmark decision focusing upon racial discrimination, phrased this statement to be inclusive of the education of all students. It is equally important to note that the plaintiffs do not seek funding for an "opportunity of an education" for their students funded at "equal terms" with more affluent school districts. They only seek a level of funding sufficient to fulfill the mandated educational requirements that the legislature and the ISBE have determined to be their responsibility. As I have previously stated, legislative and administrative enactments have resulted in the definition of a high quality education in Illinois. As a result, the courts do not have to define what constitutes a high quality education. If the students are not receiving a high quality education, the courts must hold the Governor accountable when and if schools are able to establish that the funding provided by the State is inadequate to achieve the high quality

education that they are mandated to provide. Furthermore, courts must have the ability to shape a remedy to serve the educational interests of the students of this State.

¶ 40    As the 22 school districts assert in their complaint, the State-mandated Learning Standards represent a "consensus of the citizens of Illinois as to an appropriate 'high quality' education." Because the legislature and the ISBE have determined the education students must receive, courts no longer need to make that determination in order to resolve claims that students in underresourced districts are not receiving the high quality education mandated by our State constitution.

¶ 41    This case was dismissed by the trial court. On appeal, we accept all well-pleaded facts in the complaint as true and draw all reasonable inferences from those facts in favor of the nonmoving party. *Balmoral Racing Club, Inc. v. Gonzales*, 338 Ill. App. 3d 478, 484 (2003). Considering this standard of review, I would reverse the trial court's order dismissing the quality education clause issue against the Governor.

¶ 42    Turning next to the plaintiffs' issue involving the equal protection clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 2), the majority concluded that *Edgar* is controlling and supports the trial court's order of dismissal. There, as here, plaintiffs argued that the disparity in funding between wealthy school districts and poor school districts violated the equal protection rights of students in poor districts. *Edgar*, 174 Ill. 2d at 32. In rejecting this claim, our Illinois Supreme Court explained that, although education is a "vitally important" State function, "it is not a fundamental individual right for equal protection purposes." *Id.* at 37. As such, equal protection challenges in the context of public education are subject to review under the rational basis test. *Id.* Under that test, a public-school funding system passes constitutional muster if it is "rationally related to a legitimate state goal." *Id.* The court explained that the funding system in place at the time resulted from "legislative efforts to strike a balance between the competing considerations of educational quality and local control" of school districts. *Id.* at 39. The court emphasized the deferential nature of the rational basis test (*id.*) and concluded that the public education funding system then in place was "rationally related to the legitimate state goal of promoting local control" (*id.* at 40).

¶ 43    The rationale underlying the *Edgar* court's equal protection analysis has likewise been distinguished by subsequent changes to the law. Here, the plaintiff school districts argue that the State and the Governor's failure to fund the school districts as set forth in the Funding Act results in economic disparities among school districts and violates the equal protection clause. The Funding Act likewise represents a change in the State's priorities. The Funding Act includes an express statement of legislative purpose, which provides that the overriding goal of the Funding Act is to ensure that all Illinois students have "a meaningful opportunity to learn irrespective of race, ethnicity, sexual orientation, gender, *or community-income level*." (Emphasis added.) 105 ILCS 5/18-8.15(a)(1) (West 2018). One stated aim of the legislation is to provide school districts with funding necessary to "reduce, with a goal of eliminating, the achievement gap between at-risk and non-at-risk students." *Id.* § 18-8.15(a)(1)(C). Low-income students are included in the statutory definition of "at-risk" students. *Id.* § 18-8.15(a)(4). These changes indicate that our legislature has made a policy determination that reducing inequities in school funding is an important goal. Considering these changes, I do not believe that the current funding system is rationally related to the State's legitimate goals.

¶ 44    The issue of fair and adequate funding for underresourced school districts is a crucial one for Illinois students. The impacts from the disparities among districts can be far-reaching and

devastating. One of the most important benefits of receiving a good education is that it provides students with the skills necessary "to pursue post-secondary education and training for a rewarding career." *Id.* § 18-8.15(a)(1)(B). However, a school district that struggles with all available resources to ensure that its students minimally meet the basic requirements of the Learning Standards will not have the resources to offer students college preparation classes or vocational training programs. Inadequate preparation for a college education or a trade can have a lasting impact on a student's ability to earn a living and do work he or she finds meaningful.

¶ 45     It would be unconscionable for me to neglect to acknowledge one example of the devastating impacts that result when students do not receive a high quality education—the well-documented relationship between inadequate education and the incarceration of large numbers of predominately young persons. The Illinois Department of Corrections report for fiscal year 2018 reports that only 15.7% of prison inmates graduated from high school. See Illinois Department of Corrections Fiscal Year 2018 Annual Report, at 76, https://www2. illinois.gov/idoc/reportsandstatistics/Documents/FY18%20Annual%20Report%20FINAL. pdf (last visited July 21, 2020) [https://perma.cc/G2D2-4BWQ]. It is also important to acknowledge the resulting monetary and human cost to our society and government.

¶ 46     For these reasons, I believe it is imperative that there be some avenue available to underresourced school districts like the plaintiffs to insist on funding that is adequate to serve their students and meet the goals of the Funding Act. The trial court's dismissal of this case was procedurally early in the case. By accepting all well-pleaded facts in the complaint as true and drawing all reasonable inferences from those facts in favor of the plaintiffs, I would reverse the trial court's order dismissing the equal protection clause issue against the Governor. *Balmoral Racing Club, Inc.*, 338 Ill. App. 3d at 484. This would provide an opportunity for the parties to fully develop the issues in the trial court in case the Illinois Supreme Court decides to revisit these matters.