**2021 IL 126212**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 126212)

CAHOKIA UNIT SCHOOL DISTRICT NO. 187 *et al.*, Appellants, v. J.B. PRITZKER, Governor of the State of Illinois, *et al.*, Appellees.

*Opinion filed October 21, 2021.*

JUSTICE CARTER delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Garman, Theis, Michael J. Burke, and Overstreet concurred in the judgment and opinion.

Justice Neville specially concurred, with opinion.

**OPINION**

¶ 1       The plaintiff school districts sought a judgment declaring that the defendants, Governor J. B. Pritzker[1] and the State of Illinois, have a constitutional obligation to provide them with funding necessary to meet or achieve the learning standards established by the Illinois State Board of Education. Plaintiffs asked the court to enter judgment for the necessary amounts and for the court to "[r]etain jurisdiction to enforce such schedule of payments." The circuit court of St. Clair County granted the defendants' motions to dismiss the complaint under sections 2-615 and 2-619 of the Code of Civil Procedure (735 ILCS 5/2-615, 2-619 (West 2018)). The appellate court affirmed the circuit court's judgment. 2020 IL App (5th) 180542.

¶ 2       On appeal to this court, plaintiffs have abandoned their claims against the State of Illinois but continue to assert their claims against the Governor. We hold that the Governor is not a proper defendant because he does not have authority to grant the relief requested by plaintiffs. This case does not involve an actual controversy between the parties as required to grant declaratory relief (735 ILCS 5/2-701(a) (West 2018)). Accordingly, we affirm the appellate court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4       The plaintiffs are 22 school districts located in St. Clair, Bond, Christian, Fayette, Jersey, Macoupin, Madison, Montgomery, and Peoria Counties. Plaintiffs filed a two-count first amended complaint alleging violations of article X, section 1 (the education article), and the equal protection clause of the Illinois Constitution. Ill. Const. 1970, art. X, § 1; art. I, § 2.

¶ 5       In their first amended complaint, plaintiffs alleged that the State Board of Education adopted the Illinois learning standards in 1997, setting forth the knowledge and skills that Illinois students must demonstrate at specific grade levels. Plaintiffs alleged that the learning standards were revised and expanded since their initial adoption to impose more specific benchmarks on the plaintiff school districts to ensure student achievement of those requirements. The revisions

_____

[1]The plaintiffs' complaint originally named Bruce Rauner, in his official capacity as Governor of the State of Illinois, as a defendant. The current Governor, J.B. Pritzker, has been substituted as a defendant pursuant to section 2-1008(d) of the Code of Civil Procedure (735 ILCS 5/2-1008(d) (West 2018)).

and expansion of the learning standards included the 2010 adoption of the Common Core State Standards for English, language arts, and mathematics, as required by section 2-3.64a-5 of the School Code (105 ILCS 5/2-3.64a-5 (West 2016)). In accordance with the School Code, the learning standards were developed with public involvement and comment. *Id.* Plaintiffs alleged that the learning standards, therefore, "represent a consensus of the citizens of Illinois as to an appropriate 'high quality' education for purposes of Article X, Section 1." See Ill. Const. 1970, art. X, § 1 (providing, in pertinent part, that "[t]he State shall provide for an efficient system of high quality public educational institutions and services").

¶ 6        Plaintiffs alleged that their students are being held accountable for meeting the learning standards through various assessments but that the State had failed to give the plaintiff school districts adequate funding to assist students in achieving those standards. Further, the State, in effect, evaluates school districts based on the percentage of students meeting or exceeding expectations on those assessments. Students' scores on those assessments are also part of their record and are considered in determining whether to admit them to Illinois public colleges and universities.

¶ 7        Plaintiffs further alleged that the combined state and local revenue per student in their school districts is below the average for all districts in the State and far below the revenue per student in the wealthier districts comprising the top fifth in local resources. Each of the plaintiff school districts is spending significantly less than the state average of $7712 per student in instructional expenses and $12,821 in operating expenses. In their complaint, plaintiffs included detailed tables comparing the disparity between school districts in school funding to the disparity in achieving the learning standards. Based on those tables, plaintiffs alleged there is a direct correlation between the level of funding a school district receives and the district's level of achievement on the learning standards. Plaintiffs alleged that students in their districts and other low-wealth districts fail required assessments at much higher rates than students in wealthier districts. Thus, per-student revenue is a primary determinant of whether students achieve the learning standards. Plaintiffs alleged the disparity has made it more difficult for low-wealth school districts to prevent loss of students to other schools or districts. The loss of those students further reduces the local resources used to help fund the plaintiff school districts, leading to an even greater disparity between districts.

¶ 8    Based on those circumstances, plaintiffs alleged, the General Assembly enacted Public Act 100-465 (eff. Aug. 31, 2017) (adding 105 ILCS 5/18-8.15), known as the Evidence-Based Funding for Student Success Act (Funding Act), with the purpose of providing additional funding to underresourced school districts. The Funding Act provides for calculation of specific additional amounts of "evidence based" funding necessary for underresourced districts to achieve the learning standards. Under the Funding Act, while school districts retain the level of State funding they have previously received, the underresourced districts are given priority in allocating additional funding. To that end, the Funding Act formula for State aid requires calculation of an "adequacy target" for each school district, considering "the costs of research based activities, student demographics, and regional wage differences (for teacher salaries)." The additional funding is prioritized to the districts that are least well funded in relation to their adequacy target.

¶ 9    Plaintiffs alleged that the Funding Act established a goal of meeting the adequacy targets for underresourced districts by June 30, 2027, but that goal will not be met with the State's current level of additional funding set at $350 million per year. According to plaintiffs, the State Board of Education has calculated that the State must provide an additional $7.2 billion, or a total of $15.7 billion annually, for students to achieve the learning standards and receive the "high quality" education mandated by article X, section 1, of the Illinois Constitution and the Funding Act. Ill. Const, 1970, art. X, § 1; 105 ILCS 5/18-8.15 (West 2018).

¶ 10    Plaintiffs, therefore, sought a judgment declaring that the State and the Governor have a legal duty to provide the additional funding, as required by the Funding Act. Plaintiffs alleged in count I of their complaint that the State had unlawfully failed to provide the funding necessary for plaintiffs to achieve the learning standards, in violation of article X, section 1, of the Illinois Constitution. Plaintiffs also alleged in count I that the Governor had exceeded his lawful authority by "operating a public education system that operates in this unconstitutional manner."

¶ 11    In count II, plaintiffs alleged they and their students were deprived of the right to equal protection of the laws, in violation of article I, section 2, of the Illinois Constitution. Ill. Const. 1970, art. I, § 2. In support of that claim, plaintiffs alleged

- 4 -

that the disparity in expenditures between school districts in Illinois ranged as high as $10,000 to $15,000 per student. Plaintiffs asserted those disparities in public funding are shocking, have no legitimate basis in the law, and "can no longer be justified as an acceptable consequence of the State's goal of local control over local educational effort when in recent years the State has significantly displaced local control by imposing the Learning Standards."

¶ 12        In their prayer for relief on both counts, plaintiffs asked that the court:

"A. Declare that under [article X, section 1, and article I, section 2,] the State defendants have a constitutional obligation to provide to the plaintiff districts the funding determined by [the State Board of Education] and pursuant to the 2017 [Funding Act] to be necessary to meet or achieve the Learning Standards and to reach the adequacy targets set forth pursuant to the 2017 [Funding Act].

B. Enter judgment on behalf of the plaintiff districts and against the State defendants for the amounts determined to be necessary by [the State Board] to meet or achieve the Learning Standards and to reach the adequacy targets set forth pursuant to the [Funding Act].

C. Retain jurisdiction to enforce such schedule of payments and take additional measures in whatever manner the [c]ourt deems appropriate for the State defendants to comply with this judgment.

D. Grant plaintiffs their legal fees and costs, pursuant to Section 5 of the Illinois Civil Rights Act of 2003, for claims arising under the Illinois Constitution."

¶ 13        Defendants filed a combined motion to dismiss the first amended complaint (735 ILCS 5/2-619.1 (West 2018)) (allowing combined motions under section 2-615 (*id* § 2-615) and section 2-619 (*id.* § 2-619). Under section 2-619(a)(1), defendants claimed this action is barred by sovereign immunity and that the plaintiff school districts lack standing to assert the rights of their students. Under section 2-615, defendants asserted that plaintiffs failed to state a valid claim for deprivation of their constitutional rights and that the Governor is not a proper party because he lacks authority to grant the relief requested in the complaint.

¶ 14    Following a hearing, the trial court granted defendants' motion to dismiss the complaint with prejudice. The trial court ruled that plaintiffs' claims were barred by the doctrine of sovereign immunity and that plaintiffs' complaint also failed to state a valid cause of action. Relying on this court's decision in *Committee for Educational Rights v. Edgar*, 174 Ill. 2d 1 (1996), the trial court concluded that decisions on the quality of public education and the appropriation of funds to support legislative enactments are exclusively within the authority and control of the General Assembly.

¶ 15    The appellate court affirmed the trial court's judgment dismissing plaintiffs' complaint. The appellate court held that the claims against the State of Illinois are barred by sovereign immunity. 2020 IL App (5th) 180542, ¶¶ 14-15. As for the claims against the Governor, the appellate court assumed, without deciding, that he was a proper party in this action. *Id.* ¶¶ 16-17. On the merits, the appellate court held that *stare decisis* required affirming the trial court's judgment on plaintiffs' claim alleging a violation of the education article. *Id.* ¶ 19. In *Edgar*, this court concluded that determining whether educational institutions and services in Illinois are "high quality" is outside the sphere of the judicial function. *Edgar*, 174 Ill. 2d at 32. That holding was subsequently reaffirmed in *Lewis E. v. Spagnolo*, 186 Ill. 2d 198 (1999). While plaintiffs argued that the definition of "high quality" can now be gleaned from the Funding Act and the learning standards, the appellate court observed that *Edgar* broadly concluded that it was outside the judicial function to determine whether the State was fulfilling its duty of providing a high quality education. 2020 IL App (5th) 180542, ¶ 21 (citing *Edgar*, 174 Ill. 2d at 32). In *Lewis*, this court again held that the plaintiffs could not maintain a cause of action for violation of the education article. *Lewis* 186 Ill. 2d at 210. The appellate court concluded that it could not depart from those holdings. 2020 IL App (5th) 180542, ¶ 22.

¶ 16    The appellate court also affirmed the dismissal of plaintiffs' equal protection claim, noting that in *Edgar* this court held the State's system of funding public education is rationally related to the legitimate goal of promoting local control. *Id.* ¶ 24 (citing *Edgar*, 174 Ill. 2d at 40). The appellate court held "it is for the supreme court to determine whether to alter the holding of *Edgar*." *Id.*

¶ 17    Justice Wharton concurred in part and dissented in part, agreeing with the trial court's order dismissing the claims against the State but disagreeing with the dismissal of plaintiffs' claims against the Governor. 2020 IL App (5th) 180542, ¶¶ 29-30 (Wharton, J., concurring in part and dissenting in part). Justice Wharton asserted that adoption of the learning standards and the Common Core standards had resulted in a definition of a "high quality education" in Illinois. *Id.* ¶¶ 34-36. He maintained that, "[i]f the students are not receiving a high quality education, the courts must hold the Governor accountable when and if schools are able to establish that the funding provided by the State is inadequate to achieve the high quality education that they are mandated to provide." *Id.* ¶ 39. Justice Wharton further stated that "courts must have the ability to shape a remedy to serve the educational interests of the students of this State" (*id.*) and that "[b]ecause the legislature and the [State Board] have determined the education students must receive, courts no longer need to make that determination in order to resolve claims that students in underresourced districts are not receiving the high quality education mandated by our State constitution" (*id.* ¶ 40).

¶ 18    On the equal protection claim, Justice Wharton contended that enactment of the Funding Act showed the State's priorities had shifted from an emphasis on local control to ensuring that all students have " 'a meaningful opportunity to learn irrespective of race, ethnicity, sexual orientation, gender, or community-income level.' " (Emphasis omitted.) *Id.* ¶ 43 (quoting 105 ILCS 5/18-8.15(a)(1) (West 2018)). The changes showed that reducing inequities in school funding is an important State goal. *Id.* Considering those changes, Justice Wharton would have held that the current funding system is not rationally related to the State's legitimate goals. *Id.* Accordingly, Justice Wharton would have reversed the trial court's dismissal of both counts against the Governor. *Id.* ¶ 46.

¶ 19    We allowed plaintiffs' petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Oct. 1, 2019). We also granted the Education Law Center, Chicago Lawyers' Committee for Civil Rights, Brighton Park Neighborhood Council, Chicago United for Equity, Illinois Families for Public Schools, Parents 4 Teachers, and Raise Your Hand for Illinois Public Education leave to file an *amicus curiae* brief. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 20

¶ 21    Initially, plaintiffs have not appealed the circuit court's judgment dismissing their claims against the State. In their brief to this court, plaintiffs assert that they are appealing the judgment only as it relates to their claims against the Governor, "thereby voluntarily dismissing the State itself from the case." Consistent with that statement, plaintiffs have not presented any argument in this court challenging the dismissal of their claims against the State. Thus, the only claims at issue in this appeal are the ones raised against the Governor.

¶ 22    The plaintiff school districts contend that, under the education article (Ill. Const., 1970, art. X, § 1) and the equal protection clause (*id.* art. I, § 2) of the Illinois Constitution, they are entitled to a judgment declaring their right to the funding necessary to achieve the Illinois learning standards. Plaintiffs seek an order directing the Governor to submit annual budgets calculated to provide the necessary funding by June 30, 2027, the date set for full funding in the Funding Act. See 105 ILCS 5/18-8.15(a)(1) (West 2018) (stating "[t]he purpose of this Section is to ensure that, by June 30, 2027 and beyond, this State has a kindergarten through grade 12 public education system with the capacity to ensure the educational development of all persons to the limits of their capacities in accordance with Section 1 of Article X of the Constitution of the State of Illinois").

¶ 23    The defendants filed a motion to dismiss plaintiffs' complaint for declaratory judgment under section 2-619.1 of the Code of Civil Procedure (735 ILCS 5/2-619.1 (West 2018)). Section 2-619.1 allows a party to combine into one pleading motions to dismiss under section 2-615 (*id.* § 2-615) and section 2-619 (*id.* § 2-619). A motion to dismiss under section 2-615 challenges the legal sufficiency of the plaintiff's claim, while a motion to dismiss under section 2-619 admits the legal sufficiency of the claim but asserts defenses or defects outside the pleading to defeat the claim. *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 578-79 (2006).

¶ 24    In this case, the circuit court granted defendants' motion to dismiss under both section 2-615 and section 2-619. A section 2-615 or section 2-619 motion to dismiss admits as true all well-pleaded facts and all reasonable inferences from those facts. *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 31. When ruling on a motion to dismiss under either section 2-615 or section 2-619, a court must

construe the pleadings and supporting documents in the light most favorable to the nonmoving party. *In re Parentage of M.J.*, 203 Ill. 2d 526, 533 (2003). Our review of a dismissal under either section is *de novo*. *Solaia Technology*, 221 Ill. 2d at 579.

¶ 25    As plaintiffs acknowledge, this court has developed a settled body of case law on the issues raised in this case. For an understanding of plaintiffs' claims, it is necessary to first set forth this court's more recent precedent on these issues.

¶ 26    In *Edgar*, 174 Ill. 2d 1, this court considered whether the statutory scheme governing public school funding at that time violated the education article and the equal protection clause of the Illinois Constitution (Ill. Const. 1970, art. X, § 1; art. I, § 2). As here, the plaintiffs alleged that the general state aid formula did not effectively equalize the differences in educational resources and funding that existed between the wealthy and poorer school districts. *Edgar*, 174 Ill. 2d at 8. This court began its analysis of the plaintiffs' education article claim by quoting that constitutional provision, stating:

> " 'A fundamental goal of the People of the State is the educational development of all persons to the limits of their capacities.
>
> *The State shall provide for an efficient system of high quality public educational institutions and services*. Education in public schools through the secondary level shall be free. There may be such other free education as the General Assembly provides by law.
>
> The State has the primary responsibility for financing the system of public education.' " (Emphasis in original.) *Id.* at 10 (quoting Ill. Const. 1970, art. X, § 1).

¶ 27    In construing the "efficiency requirement" in the language emphasized above, this court concluded that "[t]he framers of the 1970 Constitution grappled with the issue of unequal educational funding and opportunity, and chose to address the problem with a purely hortatory statement of principle." *Id.* at 20. This court further held that "questions relating to the quality of education are solely for the legislative branch to answer." *Id.* at 24 (explaining that "[h]istorically, this court has assumed only an exceedingly limited role in matters relating to public education, recognizing that educational policy is almost exclusively within the province of the legislative

branch"). Following a detailed analysis, this court concluded that "the question of whether the educational institutions and services in Illinois are 'high quality' is outside the sphere of the judicial function." *Id.* at 32.

¶ 28     The *Edgar* court also rejected the plaintiffs' claim under the equal protection clause, explaining that the general structure of state funding for public schools through state and local resources represents "legislative efforts to strike a balance between the competing considerations of educational equality and local control." *Id.* at 39. Applying the rational basis test, this court held that the manner the General Assembly used to strike the balance between those competing considerations was not so irrational as to offend the constitutional guarantee of equal protection. Accordingly, the plaintiffs' claims under the equal protection clause failed because the State's system of funding public education was rationally related to the State goal of promoting local control. *Id.* at 39-40.

¶ 29     This court reaffirmed this analysis a few years later in *Lewis*, 186 Ill. 2d 198. In that case, the plaintiff students challenged the adequacy of their public school education on several grounds, including under the education article. Relying on *Edgar*, this court again held that "questions relating to the quality of a public school education are for the legislature, not the courts, to decide." *Id.* at 201 (citing *Edgar*, 174 Ill. 2d 1). As this court held in *Edgar*, the definition of a "high quality" education simply cannot be determined by any judicially discoverable or manageable standards. The constitution does not provide any principled basis for a judicial definition of "high quality." *Id.* at 207. The court further explained that

> "recognition of the plaintiffs' cause of action under the education article would require the judiciary to ascertain from the constitution alone the content of an 'adequate' education. The courts would be called upon to define what minimal standards of education are required by the constitution, under what conditions a classroom, school, or district falls below these minimums so as to constitute a 'virtual absence of education,' and what remedy should be imposed. Our decision in [*Edgar*] made clear that these determinations are for the legislature, not the courts, to decide." *Id.* at 209.

¶ 30     The *Lewis* court concluded its analysis of the plaintiffs' education article claim by observing that provisions of the School Code addressed the alleged deficiencies in their schools, including lack of certified teachers, lack of basic instructional

- 10 -

materials, and unsafe buildings. *Id.* at 210. This court stated that "[t]o the extent the plaintiffs are deprived of services mandated by the School Code, their relief, if any, lies in an action to enforce the [School] Code." *Id.*

¶ 31    Plaintiffs acknowledge our prior case law on this issue, but they contend that circumstances have changed since *Edgar* and *Lewis* were decided. Plaintiffs observe that the learning standards set by the State now describe in great detail the knowledge and skills students must demonstrate at every grade level. Students are assessed annually under the learning standards, and those assessments may affect eligibility for admission to Illinois institutions of postsecondary education. Accordingly, plaintiffs argue, the State has now provided discoverable standards, allowing this court to determine whether the State is meeting its constitutional obligation to "provide for an efficient system of high quality educational institutions," as required by the education article (Ill. Const. 1970, art X, § 1).

¶ 32    Plaintiffs also contend that, by enacting the Funding Act in 2017, the legislature identified the amount of funding necessary for school districts to adequately assist their students in meeting the learning standards. The formula in the Funding Act for determining additional amounts of State aid for each school district is tied to achievement of the learning standards. Plaintiffs argue they have a constitutional right to the funding the State has deemed to be necessary to meet the learning standards and that the failure to provide funds as required by the Funding Act deprives them and their students of their constitutional right to equal protection of the laws. According to plaintiffs, the decision in *Edgar* is now "at variance with a system of standard based public education and the principles set out in the [Funding Act]." Plaintiffs conclude that a declaratory judgment will vindicate their constitutional rights and make clear to the Governor the requirement to "prepare budgets or a funding plan calculated to achieve the plaintiffs' constitutional rights by June 30, 2027."

¶ 33    The Governor responds that plaintiffs' action seeking a declaratory judgment against him is not justiciable for several reasons. The Governor maintains that the plaintiffs, as school districts, lack standing to allege violations of constitutional rights belonging to their students. The Governor also contends that he is not a proper defendant for plaintiffs' claims requesting court-ordered expenditures of State funds because he has no authority to spend State funds not appropriated by

the General Assembly. Additionally, sovereign immunity bars lawsuits against State officers that seek to control the actions of the State or subject it to liability. The "officer suit" exception to sovereign immunity is limited to cases involving an actual controversy between the plaintiff and the defendant. The Governor maintains that the exception cannot be applied here because he does not have authority to grant the relief requested by plaintiffs.

¶ 34    The Governor further contends that plaintiffs' more recent request for a judgment directing him to include specific expenditures in his annual state budget also fails. The suggested judgment dictating how he exercises his discretionary authority to propose state budgets would violate both the State's sovereign immunity and separation of powers principles. Finally, the Governor argues that plaintiffs may not obtain a declaratory judgment against him for greater public school funding because there is no actual controversy between the parties, as required to support declaratory relief.

¶ 35    We agree that plaintiffs' claims against the Governor are not justiciable. The concept of justiciability is divided into different categories, including advisory opinions, feigned and collusive cases, standing, ripeness, mootness, political questions, and administrative questions. *Morr-Fitz, Inc. v. Blagojevich*, 231 Ill. 2d 474, 488 (2008) (citing *Alternate Fuels, Inc. v. Director of the Illinois Environmental Protection Agency*, 215 Ill. 2d 219, 230 (2004)). Section 2-701 of the Code of Civil Procedure provides the general requirements for a justiciable declaratory judgment action, stating:

"No action or proceeding is open to objection on the ground that a merely declaratory judgment or order is sought thereby. The court may, in cases of actual controversy, make binding declarations of rights, having the force of final judgments, whether or not any consequential relief is or could be claimed, including the determination, at the instance of anyone interested in the controversy, of the construction of any statute, municipal ordinance, or other governmental regulation, or of any deed, will, contract or other written instrument, and a declaration of the rights of the parties interested. The foregoing enumeration does not exclude other cases of actual controversy. The court shall refuse to enter a declaratory judgment or order, if it appears that the judgment or order, would not terminate the controversy or some part thereof,

- 12 -

giving rise to the proceeding. In no event shall the court entertain any action or proceeding for a declaratory judgment or order involving any political question where the defendant is a State officer whose election is provided for by the Constitution ***." 735 ILCS 5/2-701(a) (West 2018).

¶ 36    The essential requirements for asserting a declaratory judgment action are (1) a plaintiff with a legal tangible interest, (2) a defendant with an opposing interest, and (3) an actual controversy between the parties involving those interests. *Beahringer v. Page*, 204 Ill. 2d 363, 372 (2003). The standing requirement in a declaratory judgment action is established by demonstrating that an "actual controversy" exists between adverse parties and that the plaintiff is interested in the controversy. *Morr-Fitz, Inc.*, 231 Ill. 2d at 489; *Flynn v. Ryan*, 199 Ill. 2d 430, 436 (2002). In the declaratory judgment context, an "actual controversy" means " 'a concrete dispute admitting of an immediate and definitive determination of the parties' rights, the resolution of which will aid in the termination of the controversy or some part thereof.' " *The Carle Foundation v. Cunningham Township*, 2017 IL 120427, ¶ 26 (quoting *Underground Contractors Ass'n v. City of Chicago*, 66 Ill. 2d 371, 375 (1977)). The "actual controversy" requirement ensures that courts will not " 'pass judgment on mere abstract propositions of law, render an advisory opinion, or give legal advice as to future events.' " *Beahringer*, 204 Ill. 2d at 374-75 (quoting *Underground Contractors Ass'n*, 66 Ill. 2d at 375).

¶ 37    This court's decision in *Illinois Press Ass'n v. Ryan*, 195 Ill. 2d 63 (2001), is instructive on the actual controversy requirement as it applies to this case. There, the plaintiff association and its member newspapers brought a declaratory judgment action against then-Governor George H. Ryan. *Id.* at 64. The plaintiffs sought a declaration that ethics commissions created by the State Gift Ban Act (5 ILCS 425/1 *et seq.* (West 1998)) must conduct their proceedings in public to comply with article IV, section 5(c), of the Illinois Constitution (Ill. Const. 1970, art. IV, § 5(c) (providing, with exceptions, that "[s]essions of each house of the General Assembly and meetings of committees, joint committees and legislative commissions shall be open to the public")). *Illinois Press Ass'n*, 195 Ill. 2d at 65. Ryan moved to dismiss the action, claiming he was not a proper defendant because he had no authority or control over the legislative branch's ethics commission. *Id.* at 66. This court agreed that the governor was not a proper party, explaining that

"The only ethics commission at issue here is the one that serves the legislative branch. The Governor represents a different branch of government, however. He has no authority over the legislative branch's commission; he does not select its members or exercise any control over the manner in which it conducts its proceedings. The plaintiffs and the Governor are not adverse parties to any dispute involving the ethics commission for the legislative branch of government. Accordingly, we do not believe that the present case involves an actual controversy between the plaintiffs and the Governor, a prerequisite for declaratory relief." *Id.* at 67.

¶ 38        Similarly, in *Saline Branch Drainage District v. Urbana-Champaign Sanitary District*, 399 Ill. 189, 193 (1948), this court affirmed the dismissal of a complaint seeking a declaratory judgment, holding that the complaint and motions to dismiss did not show that an actual controversy existed between the parties. In that case, the plaintiffs challenged the constitutionality of a statute governing proceedings on sanitary district detachment, but the defendant cities and sanitary district were not parties to or connected with the detachment proceeding. *Id.* at 195-96. This court stated:

"It does not appear that the defendants are asserting any right to appear in the detachment proceeding in the county court or that they exercise any control over it. The pleading does not show that an 'actual controversy' exists between the parties to this action and if an order should be entered declaring [the statute] unconstitutional, it would be abstract in character and not binding on the parties who are prosecuting the detachment proceeding." *Id.* at 195.

¶ 39        These cases demonstrate a critical problem with plaintiffs' claims in this case. In their prayer for relief, plaintiffs ask for a court order requiring the Governor to provide them with the funding necessary to achieve the learning standards. Plaintiffs request a judgment for the amounts determined to be necessary and for the court to "[r]etain jurisdiction to enforce such schedule of payments." Thus, the essential relief requested by the plaintiff school districts is a court order requiring the Governor to provide them with additional public funding.

¶ 40        The Illinois Constitution, however, "preserves the separation of powers between the three branches of government—the legislative, executive and judicial—and further provides that one branch shall not exercise the powers

- 14 -

delegated to the others." *Cook County v. Ogilvie*, 50 Ill. 2d 379, 384 (1972) (citing Ill. Const. 1970, art. II, § 1). The appropriations clause provides that "[t]he General Assembly by law shall make appropriations for all expenditures of public funds by the State." *Id.* art. VIII, § 2(b). Accordingly, "[t]he power to appropriate for the expenditure of public funds is vested exclusively in the General Assembly; no other branch of government holds such power." *State v. American Federation of State, County & Municipal Employees, Council 31*, 2016 IL 118422, ¶ 42.

¶ 41     As in *Illinois Press Ass'n* and *Saline Branch Drainage District*, the Governor is not a proper defendant here because he has no authority to take the action requested by plaintiffs. This case, therefore, does not involve an actual controversy between the parties necessary for a declaratory judgment action.

¶ 42     During this litigation, plaintiffs have also made alternative requests for relief. In addition to an order directing the Governor to provide them with additional public funding, plaintiffs have also alternatively requested (1) an order requiring the Governor to include in his annual State budget the additional funding necessary for them to achieve the learning standards and (2) an order declaring to the Governor that plaintiffs have a constitutional right to the additional public funding necessary for them to achieve the learning standards. Plaintiffs conclude their brief to this court by requesting "the declaration of a constitutional right and a directive to the Governor to act with all deliberate speed to achieve that right."

¶ 43     Plaintiffs' request for an order directing the Governor to propose additional funding in his State budget is apparently an attempt to remedy the defect in their complaint asking for an order requiring the Governor to actually provide that funding to plaintiffs. Nonetheless, the request for an order dictating to the Governor a specific funding amount to be included in his State budget also raises separation of powers concerns. Under our constitution, the power to propose a State budget is delegated to the Governor. Ill. Const. 1970, art. VIII, § 2(a). Article VIII, section 2(a), of the Illinois Constitution provides that the Governor "shall prepare and submit to the General Assembly, at a time prescribed by law, a State budget for the ensuing fiscal year," including "a plan for expenditures and obligations during the fiscal year." *Id.* As noted, that section also contains the appropriations clause, stating "[t]he General Assembly by law shall make appropriations for all expenditures of public funds by the State." *Id.* art. VIII, § 2(b). Article VIII, section

2, therefore, delegates specific powers to both the Governor and the legislature in the budget-making process. See *American Federation of State, County & Municipal Employees, Council 31*, 2016 IL 118422, ¶ 42. Plaintiffs' requested order directing the Governor to include specific additional funding amounts in his State budget would interfere with the constitutional power delegated to the Governor. Under separation of powers principles, we may not exercise constitutional powers belonging to the other branches of government. Ill. Const. 1970, art. II, § 1.

¶ 44    Further, plaintiffs' requests for an order directing the Governor to include additional funding in his State budget and for an order declaring to the Governor that plaintiffs have a constitutional right to additional public funding are simply not proper requests for declaratory relief. Section 2-701 of the Code of Civil Procedure requires an "actual controversy" and provides that "[t]he court shall refuse to enter a declaratory judgment or order, if it appears that the judgment or order, would not terminate the controversy or some part thereof, giving rise to the proceeding." 735 ILCS 5/2-701(a) (West 2018).

¶ 45    Ultimately, as pled in their complaint, plaintiffs seek a judgment requiring the State to provide them with the additional funding necessary for their students to achieve the learning standards. In their brief, plaintiffs assert that "[t]he vindication of a constitutional right will make it more likely to reach that goal" and that "the budget proposed by the Governor *** typically has an enormous impact on the actual budget that the General Assembly will pass." Plaintiffs, therefore, recognize that the proposed alternative orders will not necessarily result in the State providing the effective relief they seek in the form of additional funding. Without granting effective relief, the proposed orders would essentially amount to an advisory opinion, contrary to the actual controversy requirement for a declaratory judgment action. See *Beahringer*, 204 Ill. 2d at 374-75 (actual controversy requirement ensures courts will not pass judgment on abstract questions, render advisory opinions, or give legal advice as to future events).

¶ 46    At oral argument, counsel for plaintiffs acknowledged that an appropriation of public funds may come only from the General Assembly but stated it was important to order the Governor to do his part and that counsel did not "think [plaintiffs] were ever going to" sue the General Assembly. In their reply brief, plaintiffs assert "[i]t is hoped that a declaratory judgment will be enough to change the Governor's

conduct without any further relief." We note, however, that a declaratory judgment directing the Governor to include additional funding in his State budget or declaring a constitutional right to additional public funding may not be used by plaintiffs as a first step in forcing the State to provide those funds in future litigation. See *State Building Venture v. O'Donnell*, 239 Ill. 2d 151, 164-65 (2010); *Welch v. Illinois Supreme Court*, 322 Ill. App. 3d 345, 358-59 (2001). That is particularly true in this case, where the appellate court has already affirmed the circuit court's decision that plaintiffs' claims against the State are barred by sovereign immunity (2020 IL App (5th) 180542, ¶¶ 13-15) and plaintiffs have not appealed that judgment to this court. Thus, a judgment has been entered barring coercive relief against the State in this case for the public funding sought by plaintiffs.

¶ 47    In sum, we conclude that plaintiffs' complaint against the Governor does not present an actual controversy necessary to support a claim for declaratory relief. The Governor is not a proper party for the relief sought by plaintiffs in this case. Accordingly, we affirm the appellate court's judgment affirming the dismissal of plaintiffs' complaint.

¶ 48                                    III. CONCLUSION

¶ 49    For the reasons stated above, the judgment of the appellate court, which affirmed the judgment of the circuit court, is affirmed.

¶ 50    Affirmed.

¶ 51    JUSTICE NEVILLE, specially concurring:

¶ 52    I agree with my colleagues that the claims presented by the plaintiff school districts against the Governor were properly dismissed. That said, my concurrence in today's opinion should not be construed as diminishing the significance of the need for equitable school funding. I write separately to give voice to the magnitude of that issue.

¶ 53    In my view, it is incumbent on this court—as a coequal branch of Illinois government—to acknowledge the extreme disparity in school funding across the

state. Although this court cannot remedy that inequality, the adverse consequences suffered by students in underresourced school districts must be recognized. I believe that the importance of this issue must be highlighted to encourage the legislature to exert all efforts to achieve more equitable funding of the school districts throughout Illinois. While the recent legislative changes established by the Evidence-Based Funding for Student Success Act (Funding Act) (Pub. Act 100-465 (eff. Aug. 31, 2017) (adding 105 ILCS 5/18-8.15), are a step in the right direction, the failure to take additional remedial action risks sacrificing the futures of Illinois residents. Such failure will deprive at-risk students of the opportunity to obtain a high-quality education, which would equip them with the knowledge and skills needed to secure gainful employment—and thereby disrupt the "school-to-prison pipeline."

¶ 54        On May 17, 1954, the United States Supreme Court decided *Brown v. Board of Education*, 347 U.S. 483, 493-95 (1954), which declared that racial discrimination in public education is unconstitutional. In reaching that conclusion, the Supreme Court observed that it was necessary to "consider public education in the light of its full development and its present place in American life throughout the [n]ation." *Id.* at 492-93. The Court further noted that

> "education is perhaps the most important function of state and local governments. *** [I]t is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms." *Id.* at 493.

Recognizing the complexity of issuing decrees that would serve the needs of the plaintiffs, the Court requested further argument on several questions pertaining to the fashioning of appropriate relief. *Id.* at 495-96.

¶ 55        The following year, the Court reiterated that all provisions of federal, state, or local law requiring or permitting such discrimination were unconstitutional. *Brown v. Board of Education*, 349 U.S. 294, 298 (1955). The Court reviewed the presentations as to the appropriate remedy and remanded the cases with direction that the various courts fashion relief to make primary and secondary schools in the United States equal. *Id.* at 299-301. Sadly, the relief envisioned by the *Brown* court

has not been realized in the plaintiff school districts, and the problem of unequal education persists in Illinois to this day.

¶ 56     Article X, section 1, of the Illinois Constitution provides as follows:

"A fundamental goal of the People of the State is the educational development of all persons to the limits of their capacities.

The State shall provide for an efficient system of high quality public educational institutions and services. Education in public schools through the secondary level shall be free. There may be such other free education as the General Assembly provides by law.

The State has the primary responsibility for financing the system of public education." Ill. Const. 1970, art. X, § 1.

¶ 57     There is no question that limited and insufficient funding of schools has consequences. Students who attend such schools are unprepared to work in today's economy. And a disproportionate number of students of color end up in a juvenile detention center—and later in the penitentiary. See Chauncee D. Smith, Note, *Deconstructing the Pipeline: Evaluating School-to-Prison Pipeline Equal Protection Cases Through a Structural Racism Framework*, 36 Fordham Urb. L.J. 1009, 1018 (2009). When comparing the expenditures for education and incarceration in Illinois, the numbers reflect a dire state of affairs.

¶ 58     The Financial Impact Statements published by the Illinois Department of Corrections reflect that, during the fiscal years from 2017 to 2020, the average cost to house an individual inmate in a correctional facility ranged from $26,331 in 2017 to $34,362 in 2020. For that four-year period, the average cost to house a single inmate was $29,645. See Financial Impact Statements, Ill. Dep't of Corrections, https://www2.illinois.gov/idoc/reportsandstatistics/Pages/FinancialImpactStatements.aspx (last visited Oct. 18, 2021) [https://perma.cc/AT4T-RDTA].

¶ 59     During the same four-year period, the Illinois State Board of Education reported that the annual operating expense per pupil for the 22 plaintiff school districts ranged from $7146 (Staunton Community Unit School District No. 6) in 2017 to $17,070 (Cahokia Community Unit School District No. 187) in 2020. See Operating Expense Per Pupil (OEPP), Per Capita Tuition Charge (PCTC), and 9

Month Average Daily Attendance, Ill. State Bd. of Educ., https://www.isbe.net/Pages/Operating-Expense-Per-Pupil.aspx (last visited Oct. 18, 2021) [https://perma.cc/PC68-4P2J]. Therefore, Illinois funds its penal institutions better than it funds many Illinois school districts.

¶ 60    The failure to adequately fund public schools contributes to the well-documented phenomenon known as the "school-to-prison pipeline," which effectively shuttles students out of classrooms and into juvenile and criminal justice systems. See generally Smith, *supra*. The school-to-prison pipeline is a by-product of the systemic failure of underfunded public schools that are forced to operate with overcrowded classrooms and a lack of resources—resulting in a student population that becomes disengaged and alienated. *Id.* at 1038-39. The negative effects of underfunding education disproportionately impact at-risk students and students of color.

¶ 61    Also, when assessing educational attainment,

> "[t]he effects of poverty are exacerbated because children living in poverty are more likely to live in districts with fewer resources and to attend high-poverty schools \*\*\*. High-poverty schools consistently lack sufficient resources, parental involvement, and peer group support for educational achievement; they also often have deteriorating physical plants, less qualified teachers, and higher student and teacher turnover. Thus, it is unsurprising that high-poverty schools generally have lower achievement than non-high-poverty schools." Barbara Fedders & Jason Langberg, *School-Based Legal Services as a Tool in Dismantling the School-to-Prison Pipeline and Achieving Educational Equity*, 13 U. Md. L.J. Race, Religion, Gender & Class 212, 224-25 (2013).

¶ 62    In 2005, the NAACP published a report entitled "Dismantling the School-to-Prison Pipeline," which focused on the effect of insufficient funding in low-performing schools. See NAACP Legal Defense and Education Fund, Inc., *Dismantling the School-to-Prison Pipeline*, https://www.naacpldf.org/wp-content/uploads/Dismantling_the_School_to_Prison_Pipeline__Criminal-Justice__.pdf (last visited Oct. 15, 2021) [https://perma.cc/W3YB-9ZRH]. That report states that

"fewer resources and attention to students yield poor educational achievement and poor behavioral outcomes. The inadequacies of the public educational system, especially in areas of concentrated poverty, have set students up to fail, as continuing resource deficiencies *** lock many students into second-class educational environments that neglect their needs and make them feel disengaged from their schools." *Id.* at 4-5.

The NAACP report also observes that the combination of inadequate funding and government-mandated education-reform standards "creates perverse incentives" for school officials to "funnel out those students" who are perceived to be more likely to "drag down a school's test scores." *Id.* at 5; see also Fatema Ghasletwala, *Examining the School-to-Prison Pipeline: Sending Students to Prison Instead of School*, 32 J. C.R. & Econ. Dev. 19, 21 (2018) (observing that the low performance of underresourced schools is reinforced by government-mandated programs that demand accountability of teachers and schools). Students of color bear the brunt of inadequate educational funding and policies that transfer the focus away from education and toward incarceration. NAACP, *supra*, at 6-7.

¶ 63       And those students have an increased risk of ending up in juvenile detention centers. The Illinois Department of Juvenile Justice Annual Reports for the years 2017 to 2020 reflect that the number of juvenile offenders held in secure facilities ranged between 103 in 2020 (a significantly reduced population due to COVID-19 mitigation efforts) (Ill. Dep't of Juvenile Justice, 2020 Annual Report 3 (2021), https://www2.illinois.gov/idjj/Documents/IDJJ%20Annual%20Report%20FY202 0.pdf [https://perma.cc/9D74-FNDS]) and 384 in 2017 (Ill. Dep't of Juvenile Justice, Annual Report 2017 2 (2017), https://www2.illinois.gov/idjj/SiteAssets/Pages/Data-and-Reports/IDJJ%202017 %20Annual%20Report.pdf [https://perma.cc/L4BE-37QH]). Of the total juvenile population held during those years, the percentage of detainees of color ranged from 73% to 81%. Moreover, many of the juveniles who are detained in secure facilities do not return to the mainstream educational system, resulting in an overall drain on the economy of Illinois as a whole. See NAACP, *supra*, at 6; see also Alliance for Excellent Education, *Saving Futures, Saving Dollars: The Impact of Education on Crime Reduction and Earnings* 9 (2013), https://all4ed.org/wp-content/ uploads/2013/09/SavingFutures.pdf [https://perma.cc/4PYG-P5M6] (providing an estimate of the overall benefit to the economy of Illinois that would result from

increasing the high school graduation rate for male students by five percentage points).

¶ 64     Thus, the starvation of resources in public schools effectively perpetuates the unequal education that was outlawed in *Brown*. Based on the statistics set forth above, there can be no legitimate debate that Illinois tax revenue would be better invested by increasing funding for all the public schools rather than expending large sums on the operation of prisons. If public school funding were equal, I believe it would break the school-to-prison pipeline and reduce the number of students who end up in Illinois prisons. The future success of Illinois and its residents requires that we must make every effort to achieve that goal.

¶ 65     The solution is legislative. Here, plaintiffs requested an order directing the Governor to submit annual budgets calculated to provide full funding for each student under the Funding Act. See 105 ILCS 5/18-8.15 (West 2018). However, it is the legislative branch—not the executive branch—that has the "power of the purse" and is responsible for funding education.

¶ 66     In my view, the legislature must recognize that the disparity between the funding for penitentiaries and the funds spent on public schools demonstrates that Illinois must rethink its spending priorities. I believe that the Funding Act should be amended to make compliance with its funding goals mandatory and to impose consequences for violation of its terms. Accordingly, I concur in the result reached in today's opinion, but I strenuously urge the legislature to take additional steps to remedy the dire situation facing Illinois students in underresourced school districts.