NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230537-U

NO. 4-23-0537

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 5, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| GREGORY SMITH, | ) | Appeal from the |
| Petitioner-Appellant, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| THE DEPARTMENT OF AGRICULTURE; and | ) | No. 22MR463 |
| JERRY COSTELLO II, in His Official Capacity as | ) | |
| Acting Director of the Department of Agriculture, | ) | Honorable |
| Respondents-Appellees. | ) | Rudolph M. Braud Jr., |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Knecht and Vancil concurred in the judgment.

**ORDER**

¶ 1    *Held:*    The circuit court did not err in granting the Department of Agriculture's combined motion for involuntary dismissal.

¶ 2    This matter has a protracted procedural history arising from the attempt of CU Grow, LLC (CU), an Illinois limited liability company, to obtain a cannabis craft grower license from respondents the Department of Agriculture (Department) and Jerry Costello II as the acting director of the Department. CU's attempt to obtain this licensure ultimately resulted in petitioner Gregory Smith filing a petition for *mandamus* on CU's behalf following the Department's denial of CU's application. Smith sought an order from the circuit court of Sangamon County directing the Department and its director to, among other things, rescind and nullify the denial of CU's application, rescore the application, and reissue a final decision. The circuit court denied the motion for *mandamus*. Smith appeals, presenting numerous contentions of error. For the reasons

that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                          A. Overview of Statutory Framework

¶ 5        In June 2019, Governor J.B. Pritzker signed into law Public Act 101-27, amending the Cannabis Regulation and Tax Act (Act) (410 ILCS 705/1-1 *et seq.* (West 2020)), legalizing and regulating the use, sale, and cultivation of cannabis for recreational use by adults. In doing so the legislature declared that "[i]n the interest of establishing a legal cannabis industry that is equitable and accessible to those most adversely impacted by the enforcement of drug-related laws in this State, including cannabis-related laws, the General Assembly finds and declares that a social equity program should be established." *Id.* § 7-1(b). The Act allowed an applicant to qualify as a Social Equity Applicant (SEA) if more than half of the business is owned and controlled by individuals who have (1) "resided for at least 5 of the preceding 10 years in a Disproportionately Impacted Area" and (2) "have been arrested for, convicted of, or adjudicated delinquent for any offense that is eligible for expungement under this Act," or "is a member of an impacted family." *Id.* § 1-10. Moreover, applicants with more than 10 full-time employees can satisfy the SEA requirements if 51% of their employees meet the aforementioned qualifications. *Id.*

¶ 6        Under the Act, the Department has the authority to license and regulate craft growers, which are defined as businesses operated "to cultivate, dry, cure, and package cannabis and perform other necessary activities to make cannabis available for sale at a dispensing organization or use at a processing organization." *Id.* §§ 30-5, 1-10, 5-10.

¶ 7        Although the legislature provided a framework for licensure and regulation under the Act, it directed the Department to oversee the application process and engage in rulemaking to implement it. This command by the legislature to engage in administrative rulemaking was

- 2 -

accompanied by a requirement that the various agencies involved in administering the Act "adopt permanent rules in accordance with their responsibilities under this Act" within 180 days of its effective date. *Id.* § 55-35. The legislature also provided that if any of the various agencies, including the Department, failed to adopt rules required to implement the Act, "any citizen may commence a *mandamus* action in the circuit court to compel the agencies to perform the actions mandated under section 55-35." *Id.* § 55-40.

¶ 8 Regarding the applications of craft growers, the Act provided that the Department "shall by rule develop a system to score craft grower applications to administratively rank applications" and further provided a list of categories for points to be assigned. *Id.* § 30-15. Of these designated categories, the Act directed the Department to consider "[t]he applicant's status as [an SEA], which shall constitute no less than 20% of total available points." *Id.* § 30-15(a)(7).

¶ 9 The Department's rules implemented a scoring system where a craft grower applicant could receive a total score of 1002 points based on the designated criteria. 8 Ill. Adm. Code 1300.307(a) (2020). Pursuant to the 20% requirement in the Act, an applicant could obtain 200 points by establishing SEA status. 410 ILCS 705/30-15(a)(7) (West 2020); 8 Ill. Adm. Code 1300.307(a)(7) (2020).

¶ 10 The required form and contents of an application are outlined in the Act, as supplemented by administrative rules and the provisions of section 30-15. 410 ILCS 705/30-10 (a)(1)-(a)(22) (West 2020). For those applying as an SEA, the Department was directed to waive 50% of any nonrefundable license application fees, given certain qualifications. *Id.* § 7-20(a). However, if the Department determined that an SEA did not qualify for that status, then the applicant "shall" be given 10 days to cure any deficiency. *Id.* § 7-20(c). If the applicant was unable to cure, they were allowed to pay the outstanding fee and be considered as a non-SEA. If the

applicant failed to cure or pay, then the Department was allowed to keep the initial application fee but the application "shall not be graded." *Id.*

¶ 11 Regarding other sections of the application, "[i]f the [Department] receive[d] an application with missing information, the [Department] may issue a deficiency notice to the applicant." *Id.* § 30-10(c). If the application remained incomplete 10 calendar days after the notice, it would not be scored and would be disqualified. *Id.* The applicants that received the highest scores under the Department's rubric and received at least 75% of available points would receive craft grower licensure from the Department. 8 Ill. Adm. Code 1300.315(a) (2020). The Act required that the Department issue up to 40 craft grower licenses by July 1, 2020, and an additional 60 licenses by December 1, 2021. 410 ILCS 705/30-5 (West 2020). The total number of craft grower licenses was not allowed to exceed 150. *Id.* The time frames set forth for the issuance of the two rounds of licensing were delayed by the outbreak of the COVID-19 pandemic.

¶ 12 The Act also provides that "[a]ll final decisions of the *** [Department] *** are subject to judicial review under the Administrative Review Law and the rules adopted under that Law." *Id.* § 55-55.

¶ 13 B. CU's Application

¶ 14 In 2020, the Department accepted an unlimited number of applications for the first two rounds of licensing. CU submitted a timely application, applying as an SEA and providing the reduced $2500 application fee. CU received a deficiency notice requesting supplemental information for the social equity portion of the application on August 6, 2020. Throughout the proceedings below, and on the application itself, the social equity portion of the application was referred to as Exhibit G. Specifically, the notice stated the Department required additional evidence that a person "owning and controlling 51% of the proposed Craft Grower *** resided within a

disproportionately impacted area for 5 of the preceding 10 years." Despite technical difficulties in uploading the requested documentation to the application portal, CU purportedly submitted the requested information within the 10-day timeline.

¶ 15        On January 26, 2021, CU received a disqualification notice stating that it had (1) failed to respond to a prior deficiency notice, (2) failed to respond to a notice within the required timeline, and (3) responded to a notice but the response was inadequate to cure the deficiency. CU initiated an "internal appeal" via e-mail by requesting that the Department review the materials submitted and reverse the disqualification decision. On March 2, 2021, the Department rescinded the disqualification of CU's application, providing a notice that stated it had "improperly disqualified the application" for submitting additional supporting documentation in an untimely manner where, upon further review, the response was timely. As a result, scoring on the application would continue.

¶ 16        While CU had received the January 26, 2021, disqualification notice, all other applicants that were not disqualified received another deficiency notice providing a breakdown of deficiencies in the application exhibits. CU did not receive this notice. The Department issued another deficiency notice to all remaining applicants on March 19, 2021. CU received this notice, which provided another breakdown, exhibit by exhibit, of the deficiencies in the application. Regarding the social equity portion, Exhibit G, CU was directed to resubmit documentation establishing its SEA status, and the notice stated that CU had received no points for this section. CU uploaded documents that purported to remedy the deficiency in the application.

¶ 17        On August 17, 2021, CU once again received a disqualification notice stating that (1) CU failed to respond to a prior deficiency notice, (2) CU failed to respond to a notice within the required timeline, (3) CU responded to a notice but the response was inadequate to cure the

deficiency, and (4) the application did not receive the minimum number of points to allow for licensure. The notice further provided that:

> "This Notice for the application identified above applies to both the first round of 40 craft grower licenses pursuant to Sec. 30-5(a) of the Act and the second round of 60 craft grower licenses pursuant to Sec. 30-5(b) of the Act.
>
> Pursuant to Section 55-55 of the Act, this Notice serves as the Department's final administrative decision concerning the application identified above."

¶ 18 This notice was followed by another disqualification notice on September 10, 2021, that provided "further information" regarding the August 17 notice. The notice provided that the application was disqualified because the score was insufficient to be eligible for licensing.

¶ 19 CU once again initiated an "internal appeal" by contacting the Department via e-mail, requesting that the disqualification be rescinded. The Department responded that the application was properly disqualified following CU's failure to provide "sufficient documentation to prove 5 years of residency for a Principal Officer that was leveraged on the application as the [SEA]." This was the same documentation that was previously requested in two prior deficiency notices and purportedly submitted by CU to supplement Exhibit G.

¶ 20 On September 27, 2021, the Department began its review of the applications for the second round of licenses. It issued deficiency notices to the remaining applicants who scored the minimum number of points to remain eligible for licensing in the first round but who were not in the top 40 that received licenses.

¶ 21       C. Judicial Review

¶ 22 In October 2021, CU filed a complaint in the circuit court of Cook County seeking review of the final administrative decision pursuant to the Administrative Review Law (735 ILCS

- 6 -

5/3-101 *et seq.* (West 2020)). That matter was consolidated with a number of other cases seeking review from the same licensing process, and CU's case was transferred to the circuit court of Sangamon County. However, in December 2021, the Department issued another notice rescinding its prior disqualification of CU's application. The notice stated that the application was "improperly disqualified" and that the Department determined that the application had received at least 75% of the available points and, thus, scoring of the application would continue.

¶ 23        In the circuit court, the Department filed a motion to dismiss, arguing the request for judicial review was moot since the final determination had been rescinded. Attached to the motion was an affidavit from Sherri Baker, the bureau chief of licensing and administration, division of cannabis. Baker attested that she was familiar with CU's application for a craft grower license and that "[a]t this time [CU] remains in consideration for licenses to be issued under Section 30-5(b) of the [Act]." Further, "[CU] may receive a craft grower license if it cures the deficiencies identified in the December 6, 2021 deficiency notice in a timely manner, and receives a top score on its application that qualifies it for a license."

¶ 24        Although CU did not receive the September 27, 2021, deficiency notice, it did receive the December 6, 2021, deficiency notice identified in Baker's affidavit; that notice required additional information on various sections of the application, but not the section concerning CU's SEA status under Exhibit G. CU responded to the notice by uploading supplemental information.

¶ 25        On December 14, 2021, the circuit court granted the Department's motion to dismiss, finding that, due to the recission, there was no final administrative decision, CU remained under consideration for licensure, the matter was moot, and the court lacked subject matter jurisdiction.

¶ 26                                D. June 2022 Denial

¶ 27    On June 7, 2022, CU received a courtesy e-mail from the Department providing a copy of its craft grower application scoring results sent by certified mail on June 2, 2022. The notice stated that CU would not be receiving a license because its application fell below the second-round cutoff score of 984 points. CU's application only received 799 points. The notice also informed the applicant how many points the application received per section. Regarding the social equity section, CU received zero points. Moreover, the notice stated:

> "Pursuant to Section 55-55 of the Act, this is the Department's Final Administrative Decision regarding these applications for craft grower licenses. Administrative proceedings with respect to these applications are hereby terminated, and no further administrative remedies are available with respect to these applications. This Final Administrative Decision is subject to judicial review under the Administrative Review Law, 735 ILCS 5/3-102. Accordingly, applicants that wish to seek judicial review of this Final Administrative Decision have until July 6, 2022, to file a claim for review as provided in the Administrative Review Law, which is 35 days from the date of this Final Administrative Decision."

CU did not file a complaint for judicial review. Similar to the first round, there were a number of appeals from the denial of licensing in the second round under the Administrative Review Law that were consolidated.

¶ 28    Unlike the prior instances where CU initiated an "internal appeal" via e-mail, CU responded to the denial by sending correspondence to the Office of the Attorney General for the State of Illinois. CU alleges the attorney general responded that it did not have jurisdiction over the matter.

¶ 29    E. *Mandamus*

¶ 30        In October 2022, Smith, on behalf of CU, filed a multicount petition for *mandamus* and other relief. Relevant on appeal is count I, requesting *mandamus* relief. Smith's standing to raise claims on behalf of CU has not been contested on appeal. See *People v. Johnson*, 2021 IL 125738, ¶ 33 ("[S]tanding is ordinarily an affirmative defense that must be pleaded and proven by the defendant.").

¶ 31        CU alleged that, based on the prior history of the matter and the communications with the Department, CU's application had been accepted as an SEA. However, due to technical issues, CU was "stuck" in a situation where the Department continually failed to review the information submitted to supplement the SEA section of the application. Further, the Department lacked "rules or procedures regarding the administration" of these technical issues, resulting in CU's application receiving insufficient review as contemplated by the Act. Following the December 2021 recission notice, CU did not receive a deficiency notice informing it that the SEA documents were insufficient, and the Department accepted its application at the discounted fee; these are actions which, by statute, the Department could not take without the SEA section being deemed sufficient. CU alleged the Department had "a clear duty" to score the application properly and that it remained "incumbent upon [the Department] to follow through with their promise and award CU its 200 social equity points and the resultant license." The prayer for relief requested that the court order the Department to remedy the technical issues alleged in the petition, "rescind and nullify" the June 2022 denial, complete the scoring process of the application, and issue a new final order with the resultant score.

¶ 32        The Department filed a combined motion to dismiss pursuant to the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2022)) and a supporting memorandum. Among other things, the Department argued in its section 2-619 motion (*id.* § 2-619) that the circuit court

lacked jurisdiction to consider the *mandamus* claim because the sole method of challenging the Department's final administrative decision pursuant to the Act was by filing a timely complaint for judicial review under the Administrative Review Law within 35 days of that decision, which Smith failed to do. See 410 ILCS 705/55-55 (West 2022). The Department further argued in its section 2-615 motion (735 ILCS 5/2-615 (West 2022)) that Smith's *mandamus* claim was incomplete because he failed to identify a nondiscretionary duty that it neglected to perform; explaining that the Department exercised discretionary duties when it promulgated particular rules and scored CU's application.

¶ 33    Smith responded that section 55-40 allowed *mandamus* actions to force the Department to adopt rules to implement the Act and carry out its "responsibilities." He then argued that section 55-55 did not apply because, absent "the necessary[,] specific[,] and transparent rule set outlining the Department's responsibilities such as for scoring," the decision rendered by the Department was not final. Essentially, the petition was "based upon the Department's rules, policies and actions outside of the record." Smith requested that if the circuit court dismissed his petition, it do so with leave to amend the filing.

¶ 34                      F. Circuit Court's Judgment

¶ 35    The circuit court granted the Department's motion to dismiss, finding that the Administrative Review Law was Smith's sole remedy to challenge the scoring of CU's application. Further, the court found that the June 2022 denial was a final administrative order as contemplated by the Administrative Review Law (see 735 ILCS 5/3-101 (West 2022)). Moreover, Smith's claim that exceptions to administrative exhaustion applied was raised in a conclusory fashion and was disregarded because it was not adequately developed. On the merits, the exceptions did not apply. The court also found *mandamus* relief inappropriate because such relief would interfere with the

Department's discretionary duties. The court reasoned that, "Although [Smith] might prefer the Department to adopt different rules, neither [Smith] nor the Court can dictate the rules the Department chooses to promulgate, because that would interfere with the Department's exercise of the discretion afforded it by statute."

¶ 36        This appeal followed.

¶ 37        II. ANALYSIS

¶ 38        At best, Smith's briefing in this court can be described as meandering. His arguments bleed into one another to form a morass of claimed errors. Generally, Smith claims that his *mandamus* claim was viable and the circuit court erred in granting the Department's combined motion to dismiss. In an effort to better address the arguments presented, we attempt to sculpt them into the following categories of contentions: (1) that *mandamus* was a viable claim under the plain language of the Act to challenge the Department's final score of CU's application; (2) even if not viable under the Act, the exceptions to administrative exhaustion applied to allow a *mandamus* claim; and (3) that the claim for *mandamus* was sufficiently pled, and even if there was a deficiency, the court erred in denying leave to amend. Inextricably woven into all these arguments is the claim that the *mandamus* action was meant to force the Department to promulgate certain rules to carry out its responsibilities under the Act and that the creation of those rules would somehow retroactively cure any error in the scoring of CU's application. Having framed the issues as best we can, we now proceed to address them.

¶ 39        The circuit court in this matter granted the Department's combined motion for involuntary dismissal pursuant to section 2-619.1 of the Code. Section 2-619.1 allows a party to combine motions to dismiss under sections 2-619 and 2-615 into one structured pleading. *Kopf v. Kelly*, 2024 IL 127464, ¶ 63. A motion to dismiss under section 2-619 admits the legal sufficiency

of the claim but asserts defenses or defects outside the pleading to defeat the claim, while a motion to dismiss under section 2-615 challenges the legal sufficiency of the plaintiff's claim. *Id.* (quoting *Cahokia Unit School District No. 187 v. Pritzker*, 2021 IL 126212, ¶ 23).

¶ 40      Under section 2-619(a), the movant is essentially stating " ' "Yes, the complaint was legally sufficient, but an affirmative matter exists that defeats the claim." ' " *Reynolds v. Jimmy John's Enterprises, LLC*, 2013 IL App (4th) 120139, ¶ 31 (quoting *Winters v. Wangler*, 386 Ill. App. 3d 788, 792 (2008)). Under section 2-615, the movant is essentially saying " 'So what? The facts the plaintiff has pleaded do not state a cause of action against me.' " *Winters*, 386 Ill. App. 3d at 792.

¶ 41      The combined motion, under either section 2-619 or 2-615, " 'admits as true all well-pleaded facts and all reasonable inferences from those facts,' and the court 'must construe the pleadings and supporting documents in the light most favorable to the nonmoving party.' " *Kopf*, 2024 IL 127464, ¶ 63 (quoting *Cahokia Unit School District No. 187*, 2021 IL 126212, ¶ 24). We review dismissal under either section *de novo*. *Id.*

¶ 42      To the extent that we engage in statutory interpretation, the canons of construction are well-established. The guiding principle of statutory construction, to which all other canons and rules are subordinate, is to give effect to the intent of the legislature as determined by the express language of the statute, given its plain and ordinary meaning. *Bayer v. Panduit Corp.*, 2016 IL 119553, ¶ 18. Our review when construing the Act remains *de novo*. *Id.* ¶ 17.

¶ 43                    A. Nature of Petition Below

¶ 44      The circuit court granted dismissal as to count I because it found that, at the heart of the request for *mandamus*, Smith was actually requesting recission of the Department's decision denying CU a craft grower license. Smith disputes this assessment of his pleading. We find that a

resolution of the character of the petition for *mandamus* will simplify our review. Count I of Smith's petition was titled "Mandate: Department Adopt Rules to Address Technicalities in the Electronic Licensing Program Before Certain Final Administrative Decisions Apply." However, while the title references rulemaking, that alone does not determine the character of the pleading. See *In re Haley D.*, 2011 IL 110886, ¶ 67. Rather, the nature of a pleading is determined by its content, and we are not bound by the title. *Id.*

¶ 45 Smith alleges in his petition that the Department failed to adopt necessary and mandated rules that would have prevented the issues experienced by CU during the application process. However, Smith also contended that CU could not properly be denied a license, that the Department was unable to issue a final decision because of the technical issue, the Department was required to award CU the 200 points under the SEA section of the application or provide another chance to amend the application, and that the Department failed to properly score CU's application. In the prayer for relief of count I, Smith requests that the court direct the Department to rescind and nullify the June 2022 denial, fix the technical defect, rescore CU's application, and issue another final administrative decision. We agree with the circuit court that, while Smith does ask that the Department adopt a very specific set of rules relating to the technical difficulties encountered by CU, the focus of the relief sought was recission and nullification of the June 2022 denial (*i.e.,* so the Department could rescore the application and issue another administrative decision). The petition's request that the new rules be applied retroactively is a strong indication that CU's concern is the success of its own application, not the Department's general duty to make rules. Having determined that the substance of the petition sought to challenge the final administrative decision, we continue with our review.

¶ 46                    B. Statutory Basis for *Mandamus*

¶ 47    We find that a majority of Smith's contentions on appeal can be resolved by determining whether the Act provides for *mandamus* to challenge a final administrative decision of the Department. Smith's arguments on this point effectively challenge the circuit court's finding that it lacked jurisdiction absent a statutory basis supporting the *mandamus* claim and the explicit adoption of the Administrative Review Law.

¶ 48    To support his claim that *mandamus* is available under the Act, Smith directs our attention to section 55-40, which requires the agencies responsible for implementing the Act to promulgate rules to that end within 180 days of the effective date; if they fail to do so, "any citizen may commence a *mandamus* action in the circuit court to compel the agencies to perform the actions mandated." 410 ILCS 705/55-40 (West 2022). Pursuant to section 55-35(a) the Department was mandated to "adopt permanent rules in accordance with [its] responsibilities under this Act." *Id.* § 55-35(a). More specifically, this section goes on to list several categories on which the Department "may" promulgate rules, including "other matters under oversight by the Department *** as are necessary for the fair, impartial, stringent, and comprehensive administration of this Act." *Id.* §§ 55-35(b), (b)(8). Further, he argues that *mandamus* is still viable because article 30 (*id.* § 30 *et seq.*), governing craft growers, does not contain a section expressly providing for review under the Administrative Review Law, unlike article 15 (*id.* § 15-175) (governing licensing and regulation of dispensing organization overseen by the Department of Financial and Professional Regulation).

¶ 49    The Department points to section 55-55 of the Act, titled "Review of administrative decisions," which provides that "[a]ll final administrative decisions" of the various agencies tasked with regulation under the Act, including the Department, "are subject to judicial review under the Administrative Review Law and the rules adopted under that Law." *Id.* § 55-55.

¶ 50    After reviewing the statutory framework, it becomes clear that the statute provides a very narrow path to compel the agency to adopt rules if it has completely failed to do so, but just one avenue for judicial review of an agency's final decisions in an individual case. Section 55-55 provides that "[a]ll final administrative decisions" of the various agencies are subject to review under the Administrative Review Law. It is axiomatic that

> "[w]hen the Administrative Review Law applies, 'any other statutory, equitable or common law mode of review of decisions of administrative agencies' shall not be employed, and a party who fails to seek review of an administrative decision within the time and manner provided by the statute 'shall be barred from obtaining judicial review.' " *Pinkston v. City of Chicago*, 2023 IL 128575, ¶ 25 (quoting 735 ILCS 5/3-102 (West 2018)).

Section 55-40 provides for *mandamus* actions in a specific and limited circumstance: when the subject department "fails to adopt rules to implement" the Act within a specified time frame. 410 ILCS 705/55-40 (West 2022). Smith does not contend that rules have not been adopted, only that he thinks they should be added to. That is a matter well beyond the statutory provision for *mandamus*, applicable only when the agency has failed to adopt any rules at all. Section 55-55, on the other hand, speaks to review of final decisions in individual cases, and it would be in that context that Smith might argue against the validity of a rule as it affects him. The legislative intent is clear from the plain language of the Act: *mandamus* is not a viable cause of action to challenge a final administrative decision under the Act.

¶ 51    Smith argues against this conclusion, citing *Quinn v. Board of Election Commissioners for City of Chicago Electoral Board*, 2019 IL App (1st) 190189, and *Beauchamp v. Dart*, 2022 IL App (1st) 210091, for support. Reliance on these cases here is misguided, as both

are readily distinguishable.

¶ 52        In *Quinn*, 2019 IL App (1st) 190189, ¶ 8, the circuit court was confronted with a *mandamus* claim brought against an election authority seeking reversal of a final administrative decision. On review, the appellate court found that the relevant section of the Election Code (10 ILCS 5/10-10.1(a)(West 2016)), did "*not* adopt the Administrative Review Law," and therefore, the restrictions on other modes of judicial review contained in section 3-102 of the Administrative Review Law (735 ILCS 5/3-102 (West 2016)) did not apply. (Emphasis in original.) *Quinn*, 2019 IL App (1st) 190189, ¶¶ 33-34.

¶ 53        In *Beauchamp*, 2022 IL App (1st) 210091, ¶ 1, the plaintiff filed a complaint for administrative review of a county board's final decision, as well as a *mandamus* claim to force the county sheriff to utilize the county state's attorney as legal counsel during the proceedings. While the appellate court ultimately found the plaintiff failed to sufficiently plead the *mandamus* claim, the court refused to dismiss it for a lack of jurisdiction where the claim "sought independent *mandamus* relief to require the Sheriff to use the Cook County State's Attorney to prosecute this case and did not seek to secure reversal of an administrative decision with a writ of *mandamus*." *Id.* ¶ 17.

¶ 54        Here, the Act explicitly adopted the Administrative Review Law as the *sole* method to review administrative decisions, and Smith's *mandamus* claim is not independent. Instead, it attempts to invoke judicial review of the Department's final decision. Neither case offers any assistance.

¶ 55        Related to the statutory argument, Smith also argues that judicial review pursuant to the Administrative Review Law is inappropriate because there is no final administrative decision in this case. He goes on to present a tortured argument that styles his claim for *mandamus* as an

attempt to compel rulemaking and misconstrues the proceedings in the initial judicial review. Smith repeatedly claims he is challenging the Department's "statements of general application and policy" and that the June 2022 denial was not a final decision because "the circuit court order of January 7, 2022 dismissing [CU's] [administrative review complaint] show[s] there was no final decision from the first process." Essentially, he contends this matter was previously settled by the circuit court in that initial proceeding and refers repeatedly to "promises" made and unfulfilled by the Department therein.

¶ 56        Parsing these arguments, Smith's first assertion once again shows an attempt to bootstrap a challenge to the denial of CU's application to a *mandamus* claim. Smith admits in his reply brief that the petition was "not *solely* a request for rescoring, reviewing, reversing, or rescinding the June 2022 Final Decision," but there is no denying that this is effectively the relief he seeks. While Smith is correct that he does request additional rulemaking, as explained above, the nature of this petition sought to challenge the June denial of the application, and the proper method to challenge the decision under the Act was by appeal under the Administrative Review Law. Once again, the request that rules not only be made, but that they be applied retroactively in this case, speaks volumes about the true nature of this action.

¶ 57        The second assertion that the initial judicial review settled this matter is rebutted by the record. In that proceeding, the circuit court simply found it lacked jurisdiction because there was no longer a final administrative order from which to appeal following the recission of the August 2021 decision. Further, because CU was still being considered for a license, the appeal was moot. The court did not engage in any further fact-finding or confirm any "promises" that CU would receive a license. Smith similarly misrepresents the contents of Baker's affidavit, as there is an absence of a "promise" to issue a license anywhere in the document. Rather, Baker states CU

"may" receive a license if deficiencies were cured *and* CU's application received a top score in the second round.

¶ 58 Smith also engages in a convoluted argument that the June 2022 decision was not a final administrative decision because the Department was able to rescind the August 2021 final decision approximately three months after issuing the decision. Of course, the key difference between the two decisions is that, unlike the August 2021 notice, the June 2022 denial was not rescinded. Further, he points to alleged irregularities on behalf of the Department during the prior judicial review. However, that decision was not appealed and has no bearing on the finality of the June 2022 denial. An administrative decision from the Department is defined as "any decision, order or determination of any administrative agency rendered in a particular case, which affects the legal rights, duties or privileges of parties and which terminates the proceedings before the administrative agency." 735 ILCS 5/3-101 (West 2022). That is precisely what the June 2022 decision accomplished in this matter.

¶ 59 Having accepted as true all well-pleaded facts from the petition and the reasonable inferences that flowed from them and having construed the petition and attached documents in the light most favorable to Smith, we find that the circuit court did not err in granting dismissal based on a lack of jurisdiction pursuant to section 2-619(a)(1) of the Code (*id.* § 2-619(a)(1).

¶ 60 C. Exceptions to Administrative Exhaustion

¶ 61 Smith also argues that even if his interpretation of the Act is incorrect—which it is—established exceptions to administrative exhaustion should allow him to proceed with his *mandamus* claim, bypassing the Administrative Review Law. "The doctrine of exhaustion provides that a party aggrieved by an administrative decision ordinarily cannot seek judicial review without first pursuing all available administrative remedies." *Pinkston*, 2023 IL 128575, ¶ 24. The

exhaustion requirement allows agencies to fully consider matters before allowing an aggrieved party to seek judicial review in the hopes of insulating agency review from interruption and conserves judicial resources by allowing the agencies to correct their own errors. *Id.* "In Illinois, the common-law doctrine of exhaustion is incorporated in the Administrative Review Law." *Id.* ¶ 25. While, as discussed, when the Administrative Review Law applies, the aggrieved party is generally barred from obtaining judicial review through other methods (*supra* ¶ 50), several exceptions to the doctrine of exhaustion exist. See *Pinkston*, 2023 IL 128575, ¶ 26.

¶ 62        Smith directs our attention to several exceptions enumerated in *Castaneda v. Illinois Human Rights Comm'n*, 132 Ill. 2d 304 (1989). He argues that he asserted facts in his petition below that support the application of these exceptions but the "circuit court erred in not considering the exceptions." Smith's pleading below and his briefing here discuss only three of the several exceptions noted in *Castaneda*: futility, that the facts are not in controversy, and that he exhausted at least one of multiple administrative remedies. The Department argues that Smith forfeited his argument that the exceptions apply by failing to provide cogent arguments and citation to authority. However, even ignoring forfeiture, these arguments are without merit.

¶ 63        While Smith argues that an appeal under the Administrative Review Law would have been futile, he does not explain why. He merely states that in this case, the "circumstances are similar to those where the futility exceptions have been applied, and the same must be applied here." He does not cite any authority. Aside from failing to support the argument with authority, the dispositive defect is the failure to explain why it would have been futile to seek judicial review under the Administrative Review Law. In fact, the last time CU initiated such an action, it resulted in the rescission of the administrative decision and reinstatement of CU's application for rescoring, ostensibly the relief he seeks in his *mandamus* petition. Therefore, Smith has failed to show this

exception applies.

¶ 64        Smith also argues the facts in this case are not in controversy. However, the crux of this dispute is that CU believes it is entitled to a higher score on its application than it ultimately received from the Department; this means that the facts *are* in dispute. Smith again points to the judicial review in the first instance, arguing that this matter was decided at that juncture but, as we have explained, that matter was dismissed, not adjudicated. The *mandamus* petition is the first time this matter has been substantively reviewed by a circuit court.

¶ 65        We understand Smith's concern that the Department made at least one admitted mistake in CU's application, and it may have made others. Given the strictures of the Act, it is impossible an application leveraging social equity status that only submitted the reduced application fee due to that alleged status would be scored by the Department while receiving a score of zero on the social equity portion of the application. It would seem that either the supplemental information provided by CU was never included in the Department's review for scoring, or the supplemental information provided was insufficient and the application should never have been scored. We can draw no firm conclusions about such matters, however, for two critical reasons: (1) we do not have a complete record of the proceedings before the Department, a secondary effect of Smith eschewing review under the Administrative Review Law; and (2) more fundamentally, these factual and legal issues were properly the subject of such judicial review of the agency's decision. Accordingly, Smith has failed to establish that there are no issues of fact, so he is not excused from the requirement that he seek judicial review of these matters under the Administrative Review Law.

¶ 66        The final exception argued is that CU exhausted one of multiple available administrative remedies. While CU had obtained a prior recission from e-mail communications

with the Department, which CU termed an "internal appeal," the only available remedy under the Act was to file a complaint under the Administrative Review Law. Further, CU did not contact the Department or initiate a similar "internal appeal" following the June 2022 denial. Instead, it wrote to the attorney general, who allegedly claimed to lack jurisdiction. Because CU failed to exhaust the only remedy available to it under the Act, Smith has failed to show this exception applies.

¶ 67    Smith failed to sufficiently allege a factual basis supporting the application of the exceptions to administrative exhaustion, which justifies dismissal under section 2-615 of the Code. Further, affirmative matters rebut the application of the exceptions, resulting in dismissal under section 2-619 for lack of jurisdiction. Accordingly, dismissal of the petition was warranted.

¶ 68    D. Pleading of Nondiscretionary Function

¶ 69    Having found that *mandamus* was not a cognizable claim under these circumstances, and no amount of leave to amend would cure the fatal deficiencies identified pursuant section 2-619, the circuit court properly dismissed the petition with prejudice. However, we briefly address the issue of whether Smith's *mandamus* claim was seeking to mandate the performance of a nondiscretionary function with regard to rulemaking. In his petition, he sought the promulgation of a very specific set of rules related to the technical issues CU faced during the application process. In his reply brief, he expands upon this request to seek specific rules to further implement the social equity program under the Act.

¶ 70    "*Mandamus* will lie in a proper case to compel an officer to proceed with the exercise of discretion but not to compel him to act in a certain manner while exercising the discretion [citation]." *People ex rel. McGrady v. Carmody*, 104 Ill. App. 2d 137, 141 (1968). Discretion in performing an act arises when it may be performed in more than one lawful way, and where it is left to the performer's will or judgment to determine how the act shall be performed.

*The Y-Not Project, Ltd. v. Fox Waterway Agency*, 2016 IL App (2d) 150502, ¶ 36. While the Act imposes a duty to engage in rulemaking within a certain timeframe (see 410 ILCS 705/55-35, 55-40 (West 2022)), the Department retained discretion in formulating those rules. Here the Department has promulgated a whole host of rules to implement this statutory framework. See 8 Ill. Adm. Code 1300.300-395 (2020). The implementation of the social equity program is set forth, in its entirety, by legislative command in the Act. If the Department failed to follow those instructions, its failure would present an issue for judicial review under the Administrative Review Law. Smith's request for additional rulemaking to correct CU's specific circumstance amounts to nothing more than an attempt to compel the Department to exercise its discretion differently than it has done in the adoption of its rules. Because Smith failed to sufficiently allege a nondiscretionary duty of the Department, dismissal of the petition was warranted under section 2-615 of the Code.

¶ 71       Moreover, there was no proposed amended complaint presented to the circuit court pursuant to a motion to amend or motion to reconsider. Absent a proposed amended complaint, our ability to determine whether the circuit court abused its discretion in denying leave to amend has been inhibited. See *Loyola v. S & S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992) (noting a factor to consider in determining whether the court abused its discretion is "whether the proposed amendment would cure the defective pleading"). There is also a body of caselaw that deems the failure to provide an amended complaint as a forfeiture of the challenge to the court's dismissal with prejudice. See, *e.g.*, *Sellers v. Rudert*, 395 Ill. App. 3d 1041, 1054-55 (2009); *Illinois Non-Profit Risk Management Ass'n v. Human Service Center of Southern Metro-East*, 378 Ill. App. 3d 713, 726 (2008); *Ignarski v. Norbut*, 271 Ill. App. 3d 522, 532 (1995); *Mendelson v. Ben A. Borenstein & Co.*, 240 Ill. App. 3d 605, 619 (1992).

¶ 72                        III. CONCLUSION

¶ 73        Accordingly, the circuit court did not err in granting dismissal pursuant to sections 2-615 and 2-619 where Smith's petition sought to reverse the denial of the Department via a challenge not authorized under the Act, where no exception to the administrative exhaustion doctrine applied, and where the claim was not sufficiently pled. Having found the court below lacked jurisdiction and the claim was not and could not be sufficiently pled, the court did not abuse its discretion in denying leave to amend.

¶ 74        For the reasons stated, we affirm the circuit court's judgment.

¶ 75        Affirmed.